

**Dated: January 31, 2020.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| ROSENTHAL & WATSON, P.C. | § | Case No. 14-10286-HCM |
| Debtor. | § | (Chapter 7) |
| | | |
| KANSAS CITY SOUTHERN RAILWAY | § | |
| COMPANY and JOSE JUAREZ | § | |
| Plaintiffs | § | |
| v. | § | Adversary No. 18-01091-HCM |
| LUZ CHAVEZ, individually and as | § | |
| representative of the estates of | § | |
| RUDOLPH CHAVEZ, SR. (deceased) and | § | |
| RUDOLPH CHAVEZ, JR. (deceased); | § | |
| JOEL CHAVEZ; DARLENE CHAVEZ; | § | |
| ALLEN CHAVEZ; FRANCISCO CHAVEZ; | § | |
| and CELIA CHAVEZ | § | |
| Defendants | § | |
| v. | § | |
| ROSENTHAL & WATSON, P.C. | § | |
| Crossdefendant. | § | |

### OPINION

Here, the Court grapples with an inheritance—the latest chapter of a litigation

odyssey that began over a decade ago in a different domain.

1

The saga began in 2007, when a father and son were tragically killed in a train accident at a South Texas railroad crossing.  Surviving family members hired a law firm that immediately filed a wrongful death suit against the railway in state court.  Just before trial in 2009, the law firm (without the family's knowledge) saw fit to associate a different attorney who tried the case to a jury.  A unanimous defense verdict was rendered by the jury against the family in 2009, which appeared to end the saga.  Fate then intervened, as the family was granted a new trial against the railway based on newly discovered evidence.

In 2010, the railway made a seemingly reasonable settlement offer to the associated trial attorney hired by the family's law firm.  The associated attorney communicated the settlement offer to the family's law firm, who relayed the settlement offer to one family member.  The law firm obtained the disputed oral consent of one family member (the widow) to the railway's settlement offer on the phone, but never discussed the settlement with the four other adult family members.  After the associated attorney sent the railway a letter accepting the settlement offer for the whole family, the entire family denied authorizing any settlement.

The litigation odyssey then restarted in earnest, this time with a complete role reversal.  In 2011, the railway sued the family to enforce the settlement, winning temporary success twice through summary proceedings in state trial court.  This spawned two journeys to the Texas Court of Appeals, one journey to Texas Supreme Court, and three written appellate opinions.  Ultimately, in 2017, the settlement enforcement suit against the family was reversed and remanded for trial in state court.

Meanwhile, the lead partner of the law firm was convicted of bribing witnesses and

2

fabricating evidence in other railroad cases, resulting in a 20-year federal prison sentence.  This twist in the voyage led the law firm to close operations and file Chapter 7 bankruptcy.  The bankruptcy trustee then attempted to collect the law firm's expenses owed by the family out of the still disputed settlement with the railway, by removing the settlement enforcement suit from the domain of the state court to this Court.

Now, through this Opinion, the Court will deal with the inherited chapter of this litigation odyssey.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................. 5

   A. Adversary Proceeding Trial/Parties ................................................. 5

   B. Jurisdiction/Opinion ....................................................................... 5

II. PROCEDURAL BACKGROUND—ADVERSARY PROCEEDING ....................... 6

III. FINDINGS OF FACT ...................................................................... 8

   A. Trial and Exhibits ........................................................................ 8

   B. Parties, Witnesses, Roles, and Credibility ....................................... 9

   C. Chronology of Events ................................................................. 17

   D. Specific Subject Matters ............................................................. 41

IV. CONCLUSIONS OF LAW ............................................................... 48

   A. Enforcement of Settlement/Breach of Contract ............................... 48

   B. Breach of Fiduciary Duty ............................................................ 73

   C. Barratry ................................................................................... 87

   D. Trustee's Other Counterclaims ..................................................... 94

V. FINAL CONCLUSION ................................................................... 106

# I.
## INTRODUCTION

### A. Adversary Proceeding Trial/Parties

On December 2, 3, 4, and 19, 2019, the Court conducted a trial in this adversary proceeding. This adversary proceeding is a severed state court suit that originated in the 406th District Court of Webb County, Texas, cause no. 2017-CVA-002223-D4, which was removed to this Court.

The parties to this adversary proceeding are as follows: Kansas City Southern Railway Company and Jose Juarez (collectively "KCSR"); Luz Chavez, individually, and as representative of the estates of Rudolph Chavez, Sr. (deceased) and Rudolph Chavez, Jr. (deceased), Joel Chavez, Darlene Chavez, Allen Chavez, Francisco Chavez, and Celia Chavez (collectively "Chavez Family"); and the bankruptcy estate of Rosenthal & Watson, P.C. ("R&W"), acting through Mr. Ron Satija, in his capacity as Chapter 7 trustee ("Trustee").

### B. Jurisdiction/Opinion

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This adversary proceeding arises in and relates to a bankruptcy case referred to this Court by the U.S. District Court through the Standing Order of Reference entered in this District under 28 U.S.C. § 157(a). Both "core" proceedings under 28 U.S.C. § 157(b)(2) and "related to" proceedings under 28 U.S.C. § 157(c)(1) are involved in this adversary proceeding. The parties have expressly consented to entry of a final judgment by this Court under 28 U.S.C. § 157(c)(2). As a result, this Court has the jurisdiction and authority to enter a final judgment in this adversary proceeding.

5

This Opinion constitutes the Court's findings of fact and conclusions of law in this adversary proceeding, in accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure ("Rules"), which applies in adversary proceedings through Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").[1]  In reaching the findings and conclusions set forth in this Opinion, the Court has considered and weighed all the evidence, the demeanor and credibility of all witnesses, the admitted exhibits, the arguments of counsel, and all pleadings and briefs filed by all parties, regardless of whether they are specifically referenced in this Opinion. [2]

## II.
## PROCEDURAL BACKGROUND—ADVERSARY PROCEEDING

On February 26, 2014, R&W (as a debtor) filed a voluntary petition under Chapter 7 of the Bankruptcy Code, bankruptcy case no. 14-10286.  Shortly thereafter, the Trustee was appointed as the Chapter 7 trustee for the R&W bankruptcy estate.

On October 1, 2018, the Trustee filed a Notice of Removal with this Court under 28 U.S.C. § 1452 (dkt# 1).[3]  The Notice removed a severed state court suit styled *Kansas City Southern Railway Company, et. al v. Luz Chavez, et. al*, cause no. 2017-CVA-002223-D4 ("Severed Suit") from the 406th District Court of Webb County, Texas ("State Court") to this Court.  The Severed Suit was assigned adversary proceeding no. 18-01091 by the Clerk of this Court.  Pleadings from and orders entered by the State Court in the

---

[1] To the extent any finding of fact of the Court is construed to be a conclusion of law, it is adopted as such. To the extent any conclusion of law of the Court is construed to be a finding of fact, it is adopted as such.

[2] Cents (pennies) are intentionally omitted by the Court in the dollar figures used in this Opinion. Sense, however, is not intentionally omitted.

[3] References to "dkt#" mean the docket number maintained in CM/ECF by the Clerk of the Bankruptcy Court in this adversary proceeding no. 18-01091.

Severed Suit were filed with this Court (dkt# 1, 29, 30).

Following a status hearing in November 2018, the Court required the parties to replead under the applicable federal rules.  KCSR filed a Third Amended Complaint ("KCSR Complaint") (dkt# 18) against the Chavez Family on December 18, 2018. The Chavez Family filed their Third Amended Original Answer and Counterclaims against KCSR and Crossclaims against R&W (dkt# 27) on January 25, 2019.  The Trustee, on behalf of the R&W estate, filed an Answer to the Chavez Family's Crossclaims and Counterclaims against the Chavez Family (dkt# 36) on February 8, 2019.  With leave of Court, the Chavez Family filed their Fourth Amended Original Answer ("Chavez Answer") with Amended Counterclaims against KCSR ("Chavez Counterclaim") and Amended Crossclaims against R&W ("Chavez Crossclaims") (dkt# 50-1) on March 4, 2019.  The Trustee, on behalf of the R&W estate, then filed an Amended Answer to the Chavez Crossclaims ("Trustee Answer") and Amended Counterclaims against the Chavez Family ("Trustee Counterclaims") (dkt# 56) on March 21, 2019.

The parties expressly consented to entry of final orders and a final judgment in this adversary proceeding by the Court (dkt# 12, 13, 16).  After hearing, the Court dismissed the civil conspiracy counterclaim asserted by the Chavez Family against KCSR in the Chavez Counterclaim under Rule 12(b)(6) and struck certain affirmative defenses of the Chavez Family under Rule 12(f), by order entered on May 3, 2019 (dkt# 70).  After hearing, the Court also dismissed the civil conspiracy and perjury crossclaims asserted by the Chavez Family against the R&W estate in the Chavez Crossclaims under Rule 12(b)(6), by order entered on May 3, 2019 (dkt# 69).

A scheduling order was entered on January 24, 2019 in this adversary proceeding

(dkt# 26) ("Scheduling Order").  Following discovery and a failed mediation, docket call for trial was reset for September 4, 2019 (dkt# 87).

On August 29, 2019, the parties filed a Joint Pre-Trial Order ("PTO") (dkt# 98) with the Court.  The Court has accepted and considered the stipulated facts set forth in the PTO.  Proposed findings of fact and conclusions of law were also filed by each of the parties before trial (dkt# 93, 97, 100).  Trial briefs and post-trial briefs were also filed by the parties (dkt# 132, 139).

### III.
### FINDINGS OF FACT

The following constitutes findings of fact by the Court in this adversary proceeding. These findings include factual stipulations by the parties in the PTO.

### A. Trial and Exhibits

The trial in this adversary proceeding was conducted on December 2, 3, 4, and 19, 2019.  The Court admitted exhibits into evidence during trial.  The exhibits of KCSR admitted into evidence were P-1 through P-51 (herein "Ex. P- ").  The exhibits of the Chavez Family admitted into evidence were D-1 through D-6, D-8 through D-11, D-14 through D-18, D-20 through D-22, D-24 through D-44, and D-46 (herein "Ex. D- ").  The exhibits of the Trustee admitted into evidence were CD-5 and CD-13 (phone records initially labeled CD-8) (herein "Ex. CD- "). [4]

Excerpts from the deposition testimony of ten witnesses were admitted into evidence during trial (herein "Ex. JT-1").  After trial, a written transcript of the trial testimony of several witnesses was prepared and filed with the Court (herein "TR") (dkt#

---

[4] Duplicate copies of several exhibits were admitted at trial. The Court has considered all admitted exhibits, regardless of whether a particular exhibit is specifically referenced in this Opinion.

130, 131).

B. **Parties, Witnesses, Roles, and Credibility**

A total of 13 witnesses testified at trial.[5]  Seven witnesses testified in person.  Six witnesses testified only by deposition.  Four witnesses testified both in person and by deposition.

Following is a brief description of the parties, the witnesses, their respective roles, and an assessment by the Court of the credibility of witnesses.

KCSR

Kansas City Southern Railway Company and Jose Juarez (collectively herein "KCSR") are parties in this adversary proceeding.  Kansas City Southern Railway Company was the operator of a train that accidentally struck and killed Rudolph Chavez, Sr. and Rudolph Chavez, Jr. at a railroad crossing in Webb County, Texas.  Jose Juarez was the engineer of the lead locomotive and a railway employee at the time of the accident.  KCSR were defendants in the underlying wrongful death suit filed by the Chavez Family in 2007.  KCSR, now as plaintiffs, seek enforcement of a 2010 settlement against the Chavez Family in this adversary proceeding.

Mr. Leonard Wagner, associate general counsel of Kansas City Southern Railway Company, provided brief testimony at trial in person.  The Court finds that Mr. Wagner is a credible witness.

Chavez Family

Several members of the Chavez Family (some living, some now deceased) are

---

[5] The Court has considered and weighed all testimony of all witnesses, regardless of whether the testimony of a witness is specifically referenced in this Opinion.

parties to this adversary proceeding.  The Chavez Family were plaintiffs in the underlying wrongful death suit filed against KCSR in 2007 and were clients of R&W.  Now, the Chavez Family deny the enforceability of a 2010 settlement with KCSR of the wrongful death suit in this adversary proceeding.  Three members of the Chavez Family (Luz Chavez, Darlene Chavez, and Allen Chavez) testified at trial in person.

The Chavez Family consists of the following:

(1) Rudolph Chavez, Sr. ("Sr") died in the train accident.  Sr was the husband of Luz Chavez, and the father of Rudolph Chavez, Jr., Darlene Chavez, Allen Chavez, and Joel Chavez.  Luz Chavez is the representative of Sr's estate, and a party to this adversary proceeding in that capacity.

(2) Rudolph Chavez, Jr. ("Jr") also died in the train accident.  Jr was an adult son of Sr and Luz Chavez.  Luz Chavez is the representative of Jr's estate, and a party to this adversary proceeding in that capacity.

(3) Luz Chavez ("Luz") was the wife of Sr and the mother of Jr, both of whom were killed in the train accident.  Luz is also the mother of Joel Chavez (a minor at the time of the accident), as well as Darlene Chavez and Allen Chavez (adults at the time of the accident).  Luz is a party to this adversary proceeding and in the underlying wrongful death suit against KCSR in several capacities—individually, as representatives of the estates of Sr (her deceased husband) and Jr (her deceased son).  Luz also filed the underlying wrongful death suit against KCSR as next friend of Joel Chavez (her minor son at the time of the accident).

Luz was a key witness in this adversary proceeding.  She testified at trial in person and by deposition.  Luz suffers from legitimate memory problems and appears to have

some cognitive difficulties.  Some of her memory lapses are attributable to the stress of tragically losing a husband and son and the time that has passed since many critical events between 2007 and 2011.  Portions of sworn statements signed and filed by Luz in State Court were shown to be incorrect (at best) and false (at worst) during the trial of this adversary proceeding.  Her testimony was sometimes inconsistent, riddled with responses like "I don't remember" and "I don't recall," and when pressed, she was easily confused.  As a result, the Court gives limited weight to much of her testimony.

(4) Joel Chavez ("Joel") is a son of Sr and Luz, and a party to this adversary proceeding.  Joel was a minor at the time of the 2007 train accident and the 2010 settlement with KCSR.  His mother, Luz, filed the underlying wrongful death suit against KCSR as the next friend of Joel.  The State Court appointed guardians ad litem for Joel to evaluate the 2010 settlement with KCSR.  Joel is now an adult.  He did not testify at trial.

(5) Darlene Chavez ("Darlene") is the adult daughter of Sr and Luz, and a party to this adversary proceeding.  Darlene was an adult at the time of the 2007 accident and the 2010 settlement with KCSR.  Darlene was an individual plaintiff in the underlying wrongful death suit filed against KCSR.

Darlene was an important witness in this adversary proceeding.  She testified at trial in person and by deposition.  Darlene appeared both honest and competent.  The Court finds Darlene's testimony to be credible on matters within her personal knowledge.

(6) Allen Chavez ("Allen") is an adult son of Sr and Luz, and a party to this adversary proceeding.  Allen was an adult at the time of the 2007 accident and the 2010 settlement with KCSR.  Allen was an individual plaintiff in the underlying wrongful death

suit filed against KCSR.

Allen was also an important witness in this adversary proceeding.  He testified at trial in person and by deposition.  Allen appeared candid and forthright to the Court.  The Court finds Allen's testimony to be credible on matters within his personal knowledge.

(7) Francisco Chavez ("Francisco") was the father of Sr, grandfather of Jr, husband of Celia Chavez, and father-in-law of Luz at the time of the 2007 accident and 2010 settlement with KCSR.  Francisco was an individual plaintiff in the underlying wrongful death suit filed against KCSR.  After the 2010 settlement with KCSR, Francisco died. Francisco was a party to the Severed Suit in State Court that was removed to this Court, and thus remains a party to this adversary proceeding.

(8) Celia Chavez ("Celia") was the mother of Sr, grandmother of Jr, wife of Francisco Chavez, and mother-in-law of Luz at the time of the 2007 accident and 2010 settlement with KCSR.  Celia was an individual plaintiff in the underlying wrongful death suit filed against KCSR.  After the 2010 settlement with KCSR, Celia died.  Celia was a party to the Severed Suit in State Court that was removed to this Court, and thus remains a party to this adversary proceeding.

R&W

Rosenthal & Watson P.C. (herein "R&W") was a personal injury law firm, with offices in Austin and Brownsville, Texas.  The R&W firm was hired by the Chavez Family and filed the underlying wrongful death suit in 2007 against KCSR on their behalf. Attorneys with R&W were also involved in the 2009 jury trial against KCSR and the 2010 settlement with KCSR.  After the federal indictment and conviction of R&W partner Marc Rosenthal, R&W ceased operations and filed Chapter 7 bankruptcy in 2014.  The

bankruptcy estate of R&W (acting through the Trustee) is a party to this adversary proceeding.

<u>Non-Party Witnesses</u>

At trial, nine witnesses testified who are not parties to this adversary proceeding, as follows:

(1) Juanita "Lynn" Watson ("<u>Watson</u>") is a Texas attorney.  Watson was a named partner in the now defunct R&W law firm.  Watson was integrally involved in obtaining the Chavez Family as R&W's clients, the underlying wrongful death suit against KCSR, and seeking the consent of the Chavez Family to the KCSR settlement in 2010.

Watson was a key non-party witness in this adversary proceeding.  She testified at trial in person and by deposition.  At trial, Watson appeared competent and straightforward to the Court.  However, her testimony appeared intentionally vague and non-specific in certain critical areas, such as obtaining the approval of all adult Chavez Family members to the 2010 settlement with KCSR.  To the extent that Watson provided specific testimony, the Court finds much of her testimony to be credible.  On the other hand, Watson's generalized and vague testimony about the approval of the entire Chavez Family to the settlement and the surrounding circumstances is given limited weight by the Court.

(2) Marc Rosenthal ("<u>Rosenthal</u>") was a Texas attorney.[6]  Rosenthal was the lead named partner of the R&W law firm.  Rosenthal was involved in an initial meeting with the Chavez Family in 2007 when they hired R&W and the proposed settlement with KCSR in

---

[6] Marc Rosenthal is often referred to as "Marc" in testimony and exhibits, and should not be confused with Mark Alvarado, who is often referred to as "Mark" in testimony and exhibits.

2010. By most accounts, Rosenthal was blunt and aggressive in dealing with the Chavez Family as clients.

Rosenthal testified at trial only by deposition, taken at a federal prison where he is presently incarcerated. In 2013, Rosenthal was convicted for a criminal scheme that spanned four years. His crimes included conspiring with witnesses to provide false testimony, extortion, fabrication of evidence, bribery of a state court judge, and other acts of fraud by Rosenthal while an attorney with R&W. The conviction included actions taken by Rosenthal in several wrongful death suits filed against railroads, but do not appear to involve the suit filed for the Chavez Family against KCSR. *See U.S. v. Rosenthal*, 805 F.3d 523, 526-28 (5th Cir. 2015); (Ex. P-45). The Court gives Rosenthal's testimony little weight.

(3) James Christopher "Chris" Dean ("Dean") is a solo Texas attorney. Shortly before trial, R&W associated Dean to handle the trial of the wrongful death suit against KCSR in 2009 without the knowledge of the Chavez Family. Dean was on the front line negotiating the 2010 settlement with KCSR counsel and wrote an October 2010 settlement letter, purportedly on behalf of the Chavez Family.

Dean was an important non-party witness. As Dean testified only by deposition, the Court was unable to assess his demeanor. Dean's independent recollection of events appeared limited, and he had no direct contact with the Chavez Family regarding the 2010 settlement. In his testimony, Dean generally seemed cooperative and honest. The Court finds Dean's testimony generally to be credible on matters within his personal recollection and knowledge.

(4) Mark Alvarado ("Alvarado") is a Texas attorney that represents the Chavez

Family in this adversary proceeding. Alvarado has also worn several different hats in this decade-old saga. Alvarado was a former attorney with the R&W law firm and was personally involved in the preparation and trial of the wrongful death suit against KCSR in 2009. Following his departure from R&W in 2010, Alvarado informally represented the Chavez Family (including ghost writing briefs, pleadings, and letters for Luz) for a period of time. Alvarado was then formally retained by the Chavez Family as their attorney to continue the fight with KCSR over the 2010 settlement in State Court and in this Court.

Alvarado was a fact witness and testified in person at trial. Alvarado has continued to wear multiple hats. At trial in this adversary proceeding, Alvarado was both the attorney advocate for the Chavez Family and a fact witness.[7] Significant personal animosity exists between Alvarado (as counsel for the Chavez Family) and Merritt Clements (longtime counsel for KCSR in the disputes for the Chavez Family). Alvarado's testimony to the Court covered primarily background information regarding the lengthy litigation between the Chavez Family and KCSR. Although Alvarado appeared (for the most part) straightforward, given his dual role as advocate and witness in a bitter, lengthy dispute, the Court gives his non-background testimony only limited weight.

(5) Merritt Clements ("Clements") is a Texas attorney that has and still represents KCSR in litigation disputes with the Chavez Family. Clements represented KCSR in the 2009 jury trial of the underlying wrongful death suit, the 2010 settlement negotiations, efforts to enforce the 2010 settlement in state trial and appellate courts, and most recently,

_____

[7] At a pre-trial hearing, the Court questioned both Alvarado (attorney for the Chavez Family) and Merritt Clements (attorney for KCSR) about their dual roles as advocates and fact witnesses in this adversary proceeding, given Rule 3.08 of the Texas Disciplinary Rules of Professional Conduct.

this adversary proceeding.

Clements was also a fact witness that testified in person at trial. As a result, Clements also acted in dual roles—as an attorney advocate for KCSR and a fact witness in this adversary proceeding.  Clements' testimony included background information regarding the litigation with the Chavez Family, as well as his role in negotiating the 2010 settlement for KCSR with Dean.  Clements was candid, honest, and competent as a witness.  Given his dual role as both advocate and witness in a bitter, lengthy dispute, the Court gives his non-background testimony limited weight to the extent it was not supported by contemporaneous records.

(6) Adriana Maddox ("Adriana") is an attorney who was appointed as guardian ad litem for Joel (the minor Chavez) by the State Court with respect to the 2010 settlement with KCSR.  She practiced law with her spouse, Edward Maddox, who served as co-guardian ad litem for Joel.

Adriana played a peripheral role in this controversy.  She testified at trial only by deposition.  She only had a partial recollection of events.  In her testimony, Adriana seemed straightforward and honest.  The Court finds Adriana's testimony to be credible on matters within her personal recollection.

(7) Edward Maddox ("Edward") is also an attorney who was appointed as guardian ad litem for Joel (the minor Chavez) by the State Court with respect to the 2010 settlement with KCSR.  He practiced law with his spouse, Adriana, who also served as co-guardian ad litem for Joel.

Like his spouse, Edward had a peripheral role in this controversy.  He testified at trial only by deposition.  Edward had a limited recollection of events.  In his testimony,

Edward seemed candid.  The Court finds Edward's testimony to be credible on matters within his personal recollection.

(8) Alfonso "Pancho" Gonzales ("Gonzales") is a private investigator who R&W hired to contact Luz about the proposed 2010 settlement with KCSR.

Gonzales had a very limited role in this controversy.  He testified at trial only by deposition.  Gonzales appeared to have a good recollection of events and was candid.  The Court finds the testimony of Gonzales to be credible on the limited matters that were the subject of his testimony.

(9) Stephen T. Dennis ("Dennis") is an attorney who worked with Clements representing KCSR.  As a young lawyer, Dennis attended a scheduled deposition of a witness in the underlying wrongful death suit filed by the Chavez Family against KCSR.

Dennis provided brief testimony only by deposition, on a very tangential matter.  The Court finds that the testimony of Dennis was credible, although the subject matter of his testimony had remote relevance to the disputes in this adversary proceeding.

## C. Chronology of Events

Following is a factual chronology of the key events, which also constitute findings of fact by the Court, after weighing all the evidence and the credibility of all witnesses.

Train Accident/Engagement Contract (2007)

On February 15, 2007, a Kansas City Southern Railway Company locomotive collided with a pickup truck at a grade crossing in Webb County, Texas.  Jose Juarez, an employee of the railway, was the engineer on the lead locomotive.  As a result of the train accident, Rudolph Chavez, Sr. (herein "Sr"), a father, and Rudolph Chavez, Jr (herein "Jr"), an adult son, suffered fatal injuries.

Within a week of the train accident, Rosenthal and Watson of the R&W law firm met with the Chavez Family, as well as other relatives, in South Texas.  At the meeting, the Chavez Family decided to hire R&W as their counsel to file a wrongful death suit against KCSR.

By late February 2007, each member of the Chavez Family signed a Power of Attorney with Assignment of Interest ("Engagement Contract") with R&W to represent each of them in pursuing claims against KCSR for the train accident.  (Ex. CD-5).  Luz (the widow of Sr) executed an Engagement Contract individually and on behalf of the estates of Sr and Jr and her minor son Joel.  Darlene (the adult daughter of Sr), Allen (the adult son of Sr), Francisco (the adult father of Sr), and Celia (the adult mother of Sr) all individually executed an Engagement Contract with R&W as well.  Although the signature of the Chavez Family members on each Engagement Contract is not notarized, there is no dispute that each member of the Chavez Family actually signed an Engagement Contract with R&W.  Watson, on behalf of R&W, signed each Engagement Contract.

In general, each Engagement Contract provides that the "Client" (each a member of the Chavez Family) employs the "Attorneys" (R&W) [8] to represent the Client and file legal action and claims against KCSR arising out of the train accident.  R&W was assigned 40% of the claims and any amounts received by settlement or judgment by each Client if suit was filed (in essence, a 40% contingency fee).  R&W was also authorized to incur expenses on behalf of each Client (including expert and witness fees, medical

---

[8] "The Law Offices of Jim Solis" is also defined as "Attorneys" along with R&W in each Engagement Contract.  However, no Engagement Contract was signed by the Law Offices of Jim Solis.  The evidence at trial did not prove that Mr. Solis was an attorney with R&W and did not establish that Mr. Solis actively represented the Chavez Family with R&W in the litigation with KCSR.

expenses, litigation expenses, administrative expenses, and trial preparation expenses),

to be reimbursed by the Chavez Family from any recovery or settlement.  R&W was also

granted a contractual attorney's lien in the Engagement Contracts.

     Significantly, with respect to settlement authority, the Engagement Contract signed

by each member of the Chavez Family with R&W provides as follows:

> I fully authorize and empower my said Attorneys . . . to bring suit . . . and/or
> to compromise and settle said claims . . . in any way or manner that
> Attorneys deem best or advisable; however, NO SETTLEMENT OF MY
> SAID CLAIMS MAY BE MADE BY MY ATTORNEYS WITHOUT MY
> CONSENT.
> . . .
>
> I hereby authorize Attorneys and such other attorneys or law firms as
> Attorneys in their sole discretion shall employ or associate with in my behalf,
> to enter into settlement negotiations on my behalf as Attorneys deem
> appropriate, including Attorneys' prerogative to pursue cash and/or
> structured settlement negotiations.  *The Attorneys shall neither settle nor
> compromise this matter without my final approval* . . .

(Ex. CD-5) (capitalization in original) (emphasis added).

<u>Wrongful Death Suit and Jury Trial (2007-2009)</u>

     On March 2, 2007, on behalf of each member of the Chavez Family, R&W filed a

wrongful death suit against KCSR in the 406th District Court of Webb County, Texas

(herein "<u>State Court</u>"), cause no. 2007-CVE-00347-D4.  The plaintiffs in the wrongful

death suit were the Chavez Family, consisting of: (1) Luz, individually; (2) Luz, acting on

behalf of the estate of her deceased husband, Sr; (3) Luz, acting on behalf of the estate

of her deceased son, Jr; (4) Luz, as next friend of her minor son, Joel; (5) Darlene

individually, the adult daughter of Sr; (6) Allen individually, the adult son of Sr; (7)

Francisco individually, the adult father of Sr; and (8) Celia individually, the adult mother

of Sr.

Over the next few years, R&W spent significant time and expense in preparing the wrongful death suit for trial in State Court. Numerous contested discovery and pretrial hearings were conducted in the suit. R&W incurred substantial and necessary out-of-pocket expenses on behalf of the Chavez Family in trial preparation and at trial, including the cost of multiple experts, reports, research, investigation, depositions, discovery, and travel. R&W also made regular advances to Luz for living expenses, and occasionally provided financial assistance to Darlene for living expenses prior to trial.

The wrongful death suit was set for jury trial in early December 2009. Unknown to the Chavez Family, shortly before trial, R&W unilaterally associated Dean to act as lead trial counsel for the Chavez Family in the wrongful death suit. On November 23, 2009, Alvarado (at the time an attorney with R&W), filed a Notice of Appearance of Counsel in the State Court identifying Dean as an additional attorney of record for the Chavez Family. (Ex. P-9). The Chavez Family was completely unaware that a notice of appearance of Dean as their counsel had been filed in the suit. In late November 2009, Dean appeared at pre-trial hearings in the wrongful death suit in State Court, along with Alvarado of R&W.

The Chavez Family did not hire or retain Dean as their attorney in the wrongful death suit. The Chavez Family did not agree to Dean's participation in the suit or subsequent settlement negotiations. The Chavez Family never intended or thought they had an attorney-client relationship with Dean. There was never an understanding or agreement by the Chavez Family regarding the nature of legal work to be undertaken by Dean. Dean could not specifically recall meeting with any member of the Chavez Family.

Neither R&W nor Dean obtained the written or verbal consent of the Chavez Family to the hiring or association of Dean by R&W, or even discussed with the Chavez Family

20

that Dean was going to appear in the suit on their behalf.  Dean's fee arrangement with R&W in the wrongful death suit was part contingency fee and part flat fee.  Neither R&W nor Dean obtained the written or verbal consent of the Chavez Family to this fee sharing arrangement or even discussed it with the Chavez Family.  No contract or other writing was signed between Dean and any member of the Chavez Family.  However, Dean reviewed the Engagement Contract between R&W and the Chavez Family, which prohibited the attorneys from settling without the client's consent and final approval.

Starting in early December 2009, a jury trial was conducted in the wrongful death suit brought by the Chavez Family against KCSR in State Court.  Dean served as lead counsel for the Chavez Family at trial.  Attorneys with R&W also participated in the jury trial for the Chavez Family.  Lead trial counsel for KSCR at the jury trial was Clements.

Outside the courtroom during the jury trial, Watson of R&W told Darlene of the Chavez Family that Dean would be assisting R&W during the trial.  This was the first time that any member of the Chavez Family ever heard of Dean or saw that Dean would be acting as an attorney for the Chavez Family at trial.  Darlene immediately told R&W that hiring Dean was not part of their agreement.  Some members of the Chavez Family (Luz and Darlene, and Allen when he was in attendance) saw Dean speaking on their behalf during the jury trial, as well as R&W attorneys.  Other members of the Chavez Family (elders Francisco and Celia) did not attend the trial and never even saw Dean.  None of the Chavez Family members attending the jury trial voiced any opposition to the judge during the trial about Dean acting as one of their attorneys.

After a lengthy trial, the jury returned a unanimous defense verdict in favor of KCSR in the wrongful death suit in mid-December 2009.

New Trial/KCSR Settlement (2010-2011)

Alvarado left the law firm of R&W in January 2010 due to the firm's financial difficulties, and worked sporadically thereafter on a contract basis for R&W. In early 2010, Rosenthal was sent a target letter by the government. Watson of R&W became aware that Rosenthal was under investigation for crimes for which he would ultimately be indicted and convicted. This had a negative effect on the financial productivity of the R&W law firm.

In January 2010, based on the December 2009 jury verdict, the State Court entered a final judgment that the Chavez Family recover nothing on their claims against KCSR in the wrongful death suit. Dean appeared as counsel for the Chavez Family at post-trial hearings in the wrongful death suit, unbeknownst to the Chavez Family.

In early 2010, R&W, with the assistance of Dean, filed a motion for new trial in the wrongful death suit on behalf of the Chavez Family. The request for new trial was based in part on newly discovered evidence regarding the trial testimony of the train engineer (Mr. Juarez) about cell phone usage prior to the train collision. In March 2010, the State Court granted the motion, set aside its final judgment, and ordered a new trial in the wrongful death suit. (Ex. D-1). The new trial was scheduled to commence on November 15, 2010.

In the summer of 2010, Dean (purporting to act on behalf of the Chavez Family) began negotiating with Clements (counsel for KCSR) about settlement of the wrongful death suit. Dean admitted that he did not have authority from the Chavez Family to enter into any settlement; instead, Dean relied upon R&W to communicate with the Chavez Family about settlement and obtain their consent. No members of the Chavez Family

were aware that Dean was undertaking settlement negotiations or authorized Dean to negotiate or settle on their behalf.

In July 2010, Clements (counsel for KCSR) emailed Dean with a lump-sum offer of $400,000 to settle the claims of all Chavez Family members, subject to conditions. The conditions included a full release of all claims, a confidentiality clause with a liquidated damages provision of 10% if breached, and indemnification by the Chavez Family. Clements (on behalf of KCSR) also offered to pay the fees of the guardian ad litem for minor Joel. In August 2010, Clements (on behalf of KCSR) provided an increased lump-sum settlement offer of $500,000 to Dean to settle the claims of all members of the Chavez Family, subject to the same conditions.

In August 2010, Dean communicated the lump-sum $500,000 settlement offer from KCSR to Rosenthal and Watson of R&W. Rosenthal, working by himself, allocated the $500,000 lump-sum settlement offer from KCSR among his multiple clients (the Chavez Family members) and R&W for expenses. Rosenthal's internal allocation of the lump-sum $500,000 settlement offer between his clients is outlined in Watson's case notes dated September 2, 2010. (Ex. P-4, p. 1).

In late August 2010, Rosenthal apparently called Luz of the Chavez Family to discuss the $500,000 settlement offer from KCSR. In their testimony, neither Rosenthal nor Luz could accurately or coherently recount any of their discussions. Luz, at various times, stated that Rosenthal yelled at her and tried to pressure her into accepting the $500,000 settlement offer, and that she told Rosenthal that she did not want to settle with KCSR. In contrast, Rosenthal was under the impression that Luz was supposed to get back to him about the KCSR settlement offer after their discussion. All the Court can find

about this particular settlement discussion (if it actually occurred), is that Luz did not accept the $500,000 KCSR settlement offer in any discussion with Rosenthal, and that Rosenthal never discussed the $500,000 settlement offer or his proposed allocation of the settlement with his other four adult clients (Darlene, Allen, Francisco, and Celia).

A few days later, in early September 2010, Rosenthal relayed the $500,000 settlement offer to his partner Watson and requested her assistance. Rosenthal asked Watson to try to reach Luz and get an answer to the $500,000 settlement offer from KCSR. Watson then began to attempt to reach Luz by phone to discuss the proposed settlement. When Luz did not return her call, Watson directed R&W staff to try and reach Luz.

In the following weeks, R&W staff repeatedly tried to reach Luz by phone on nine different days between September 7, 2010 and September 27, 2010. Luz did not return any of these calls, and Luz was clearly reluctant to speak with R&W. This led Watson of R&W to hire private investigator Gonzalez to reach Luz and encourage her to contact R&W about the proposed KCSR settlement. Ultimately, Gonzalez made brief contact with Luz near her home on September 28, 2010, and Luz then called R&W's office.

In the evening of September 28, 2010, Luz and Watson had about a 19-minute phone call regarding the $500,000 settlement offer from KCSR. No other member of the Chavez Family was present during the call.

During this September 28 phone call, Watson explained to Luz that KCSR had made a $500,000 settlement offer. Watson also verbally provided Luz with numerous specific figures about the allocation of the $500,000 devised by Rosenthal among the various members of the Chavez Family, the amounts allocated for the workers

compensation liens of Service Lloyds Insurance Company ("Lloyds"), the amounts allocated to R&W's fees, and the amounts allocated to reimburse R&W for expenses. Watson also told Luz that R&W would refund to Joel and Luz the statutory attorney's fees to be received by R&W for recovery of the workers' compensation lien, and that R&W would receive no fees through the settlement. Watson also advised Luz that R&W had out-of-pocket case expenses of over $400,000, but R&W would take only $300,000 out of the settlement for expense reimbursement. In sum, according to Watson's case notes, the Chavez Family members would pocket about $140,000; the workers' compensation carrier would receive about $60,000; and R&W would be paid $300,000 as reimbursement for case expenses. (Ex. P-4, pp. 1-4).

None of these numerous specific figures and the complex allocation of the $500,000 settlement offer was put in writing by Watson or R&W for Luz to review. Watson and R&W never met in person with Luz to explain the offer and the complicated allocation created internally by Rosenthal. The lump-sum $500,000 settlement offer and its allocation was not communicated or discussed in any manner by Watson or R&W with R&W's other clients—the remaining four adult members of the Chavez Family (Darlene, Allen, Francisco, and Celia). Watson told Dean that she had specifically worked these allocation numbers with the clients, and that they had approved the numbers; but Watson had not. Watson only discussed the settlement allocation with one client—Luz.

During the September 28 phone call, Watson did not tell Luz that Dean was negotiating a settlement on the family's behalf with KCSR. Watson also did not advise Luz that the $500,000 settlement offer by KCSR to Dean was subject to conditions—such as a confidentiality clause with a 10% liquidated damages provision and indemnification

by the Chavez Family.

Conflicting evidence at trial in this adversary proceeding was presented regarding whether or not Luz accepted the $500,000 settlement offer conveyed by Watson during their phone call on September 28, 2010. Luz, at various times, has stated that she never accepted the $500,000 settlement offer, yet Luz also testified that she could not remember having this phone call with Watson about the settlement. In contrast, Watson's testimony was specific and consistent that Luz accepted the settlement offer during this phone call. Significantly, this aspect of Watson's testimony was supported by Watson's contemporaneous written case notes. (Ex. P-4, p. 4).

After weighing all the evidence and the credibility of the witnesses, the Court makes three additional specific findings of fact relating to this September 28, 2010 phone call between Watson and Luz about the $500,000 KCSR settlement offer.

First, the Court finds that Luz **did** tell Watson that she accepted the settlement offer conveyed in this phone call on September 28, 2010.

Second, the Court finds that Luz **did not** fully understand the settlement offer conveyed by Watson in the September 28 phone call. Watson verbally explained a complex settlement allocation with an attendant series of numbers to Luz that made up the $500,000 offer. Numerous legal technicalities associated with payment of workers compensation liens, interruption of benefits, and payment of statutory attorney's fees to R&W for recovery of such liens were thrown at Luz in this phone call as well, which Luz did not understand. A slew of information was communicated verbally to Luz in one relatively short phone call by Watson. None of these figures or information were put in writing by Watson to Luz, a client with apparent cognitive and memory problems. Luz did

26

not give an effective informed consent to the settlement offer.

Third, the Court finds that Luz **did not** accept the settlement offer on behalf of the rest of the adult members of the Chavez Family (Darlene, Allen, Francisco, and Celia) in the September 28 phone call.  Luz only accepted the settlement offer on behalf of herself. Although Luz was the primary point of contact between the Chavez Family and R&W regarding settlement matters, Watson's case notes from the phone call do not reflect that Luz accepted the settlement offer on behalf of the other adult members of the Chavez Family.  (Ex. P-4, p. 4) ("Luz said that *she* was giving permission to get the case settled . . .").  Each of the other Chavez Family members (Darlene, Allen, Francisco, and Celia) were adults, each had their own individual claims against KCSR, and each were clients of R&W.  None of these other adults were consulted or even informed of the KCSR settlement offer by R&W, and none of them were present during the September 28 phone call between Watson and Luz.

On September 28, 2010, immediately after completing the phone call with Luz, Watson called Dean and advised him that the clients wanted to accept the KCSR settlement offer.  Watson also advised Dean that they needed to speak further about how to allocate the recovery.  R&W and Watson believed that the $500,000 settlement offer made by KCSR was a reasonable and good offer, which R&W recommended.

Unknown to Watson at the time of her September 28 phone call with Luz, KCSR had increased its lump-sum settlement offer to $525,000, subject to its previous conditions, by email sent by Clements to Dean on September 14, 2010.  This $25,000 addition was apparently allocated to R&W expenses by R&W—increasing the amount of expenses to be reimbursed to R&W under the proposed settlement to $325,000 from

$300,000.  Dean continued to press KCSR to increase its offer.  In early October 2010, KCSR agreed to increase its offer by $1,000 per claimant to serve as consideration for a confidentiality clause in the settlement.  These additional amounts and allocations were never discussed by R&W or Dean with any member of the Chavez Family.

On October 5, 2010, Dean (purportedly on behalf of the Chavez Family) sent a letter by email to Clements (counsel for KCSR) confirming that the parties had reached an agreement to settle the wrongful death suit ("Dean Letter").  (Ex. P-1).  The Dean Letter stated that the settling Chavez Family members consisted of Luz, individually and as representative of the estates of Jr and Sr and as next friend of minor Joel, as well as Darlene, Allen, Francisco, and Celia.

According to the Dean Letter, the total settlement amount to be paid by KCSR was $531,000, which was allocated to be paid as follows:

(1) $325,000 to R&W as reimbursement for case expenses;
(2) $46,000 allocated to Luz individually, by check for $30,666 payable to Lloyds as payment of the workers compensation lien and by check for $15,333 payable to R&W [9] reflecting the workers compensation carrier's payment of the statutory attorney's fee for recovery of the lien;
(3) $46,000 allocated to Luz as next friend of Joel, by check for $30,666 payable to Lloyds as payment of the workers compensation lien and by check for $15,333 payable to R&W reflecting the workers compensation carrier's payment of the statutory attorney's fee for recovery of the lien;
(4) $46,000 allocated to and by check payable to Darlene;
(5) $46,000 allocated to and by check payable to Allen;
(6) $11,000 allocated to and by check payable to Francisco; and
(7) $11,000 allocated to and by check payable to Celia.

(Ex. P-1).

Dean sent Watson of R&W a copy of the Dean Letter.  No members of the Chavez

---

[9] R&W had agreed in Watson's phone call with Luz that the amounts payable to R&W as the statutory attorney's fee for recovery of the workers compensation lien from Luz's and Joel's allocation ($15,333 each in the Dean Letter) would be refunded by R&W to Luz and Joel.

Family were sent a copy of the Dean Letter or were even aware that it was sent on their behalf by Dean at the time.  The Chavez Family did not authorize Dean to send the Dean Letter to KCSR's counsel and were not even aware that Dean was negotiating a settlement with KCSR.  The Dean Letter was never signed by any member of the Chavez Family or by R&W.

Promptly after receiving the Dean Letter, KCSR's counsel, Clements, responded to Dean by email on October 5, 2010, stating that "[s]ubject to the conditions set out in my earlier letter, we have a deal."  (Ex. P-27).  The "subject to" conditions set by KCSR included a confidentiality clause with a 10% liquidated damages provision in the event of breach by the Chavez Family and indemnification by the Chavez Family. (Ex D-17).  The Chavez Family were never advised of these "subject to" conditions set by KCSR, and never agreed to such conditions. [10]

The Dean Letter was not signed by KCSR or by counsel for KCSR.  KCSR and its counsel did not investigate the existence or scope of any authority that Dean had to negotiate or send the Dean Letter on behalf of the Chavez Family.  KCSR counsel knew that Dean was only a middleman between R&W and KCSR with respect to settlement, and that R&W was in charge of client communications about the settlement.

During the months of October and November 2010, Dean communicated with Lloyds about resolution of their subrogation liens and rights against any settlement recovery by Luz and Joel.  (Ex. P-31).  Lloyds was the workers' compensation carrier paying benefits to Luz and Joel.

---

[10] KCSR has advised the Court that they are not attempting to enforce these conditions against the Chavez Family in this adversary proceeding.

In early November 2010, counsel for KCSR sent a proposed formal Settlement Agreement and Release of All Claims with Confidentiality and Indemnification Obligations ("Settlement Agreement") to Dean for comment. (Exs. D-20, D-21). Among other provisions, the proposed Settlement Agreement contained a confidentiality clause with a liquidated damages clause and an indemnity by the Chavez Family in favor of KCSR. The proposed Settlement Agreement has separate signature blocks for each of the Chavez Family members (Luz, individually, and in her representative capacities; and for Darlene, Allen, Francisco and Celia). The members of the Chavez Family never saw or signed the proposed Settlement Agreement.

On November 10, 2010, Dean sent a letter to the State Court, advising that the parties had reached an agreement and requesting that the wrongful death suit be removed from the November 15, 2010 trial docket. (Ex. P-33). Dean was not asked by R&W to prepare for trial.

On November 15, 2010, R&W and Dean filed a Motion for the Appointment of a Guardian Ad Litem with the State Court, on behalf of the Chavez Family. (Ex. D-24). The Chavez Family was not informed that this motion would be filed on their behalf. A guardian ad litem needed to be appointed for Joel (a minor) to evaluate any proposed settlement, determine whether it was in the best interest of the minor Joel, and make a recommendation to the State Court regarding approval of any settlement of the minor Joel's claims.

On November 18, 2010, the State Court granted this motion, and signed an order appointing Adriana Maddox (herein "Adriana") as guardian ad litem for Joel. (Ex. D-25). Thereafter, the State Court recognized and appointed Edward Maddox (herein "Edward"),

Adriana's husband and law partner, as co-guardian ad litem for Joel. (Exs. P-10, P-35, P-46). Adriana and Edward then began investigating the minor Joel's claims, the proposed settlement as it related to Joel, and the subrogation liens asserted by Lloyds against Joel's proposed recovery. (Ex. P-6).

In March 2011, KCSR filed a Motion to Set Hearing Regarding Minor's Settlement with the State Court. (Ex. D-27). In part, such motion stated that on October 5, 2010 the parties reached a tentative settlement, and that the settlement was contingent on the State Court's approval of the settlement as it affected the minor Joel.

On March 8, 2011, the State Court sent notice of a hearing to be held on April 7, 2011 to approve the settlement of the minor Joel's claims to attorneys of record in the wrongful death suit, including Dean and R&W. R&W notified Luz of the April 7 hearing on the minor's settlement and requested Luz to attend. The other adult client members of the Chavez Family were not notified by R&W of the April 7 hearing or its purpose.

On April 6, 2011, the day before the April 7 hearing, Luz met with Adriana (the ad litem) at Adriana's office in Laredo to discuss the terms of the proposed settlement of minor Joel's claims. At that meeting, Luz did not express to Adriana that she had any objection to the proposed settlement of Joel's claims.

On April 7, 2011, the State Court conducted its first hearing to consider approving settlement of the minor Joel's claims. R&W hired Alvarado to travel and attend this hearing. Adriana (the ad litem) was unable to attend this hearing, so her husband and law partner Edward attended. On the morning of April 7 and before the hearing started, Edward met with Luz to again review the settlement. During that meeting with Edward, Luz voiced no objections to the settlement. However, shortly before the start of the April

7 hearing, Luz told Alvarado that she had "changed her mind" about the settlement.

During the hearing on April 7, 2011, Luz informed the State Court that she did not desire to go forward, requested at least three months to find another law firm, and that she no longer wanted to continue with R&W as counsel because she did not feel comfortable with R&W at all. (Ex. P-10). Luz did not mention Dean, as she did not know or think Dean was her counsel. This was the first time that Luz or any member of the Chavez Family had indicated to the State Court that they were dissatisfied with R&W or any of their counsel. During the April 7 hearing, Luz never told the State Court that she objected to the terms of the settlement, although Edward (the ad litem) advised the State Court that Luz was not satisfied with the settlement and the settlement was against her wishes.

At the conclusion of the April 7, 2011 hearing, the State Court set a status hearing for May 31, 2011 for the purpose of learning what Luz had decided about her lawyers and if Luz had hired new counsel. The State Court announced the May 31, 2011 status hearing on the record with Luz in attendance, and thus Luz had notice of the May 31, 2011 status hearing.

Prior to this April 7, 2011 hearing, no member of the Chavez Family notified R&W or the State Court that the Chavez Family was terminating R&W as their counsel. No member of the Chavez Family notified Dean or the State Court that the Chavez Family was terminating Dean as their counsel. That the Chavez Family did not inform the State Court or Dean about Dean's termination is not surprising, given that the Chavez Family never hired Dean and did not even know that Dean was acting as their counsel in settlement negotiations.

On April 28, 2011, KCSR filed a Motion to Enforce Settlement Agreement with the State Court.  (Ex. D-37).  In this motion, KCSR stated that Dean, as the lead trial counsel for the Chavez Family, and Clements, as lead trial counsel for KCSR, negotiated a settlement of the wrongful death suit in September and October 2010.  KSCR also stated that the essential terms of the settlement were set forth in emails between Clements and Dean and a letter sent by Dean to Clements on October 5, 2010 (the Dean Letter).  Through this motion, KCSR requested that the State Court enforce the settlement agreed to by Dean (as counsel for the Chavez Family) and Clements (as counsel for KCSR).  This motion was not served by KCSR on Luz or any member of the Chavez Family. The State Court set a hearing on this motion for May 31, 2011, the same day that was previously set for a status hearing.

At some point in May 2011, Alvarado (a former attorney with R&W) began advising and informally representing Luz.  Alvarado became the "ghost writer" of several letters, affidavits, pleadings, and a brief subsequently filed by Luz with the State Court and the Texas appellate court.

On May 31, 2011, the State Court conducted a hearing on the Motion to Enforce Settlement Agreement filed by KCSR, the same date as the previously noticed status hearing.  (Ex. P-46).  Clements, as counsel for KCSR, attended this hearing, as well as Edward (ad litem for Joel) and Watson of R&W.

At the May 31 hearing, Watson advised the State Court that it was clear that R&W had been discharged as counsel for the Chavez Family based on the April 7 hearing, and that R&W had not yet filed a motion to withdraw as counsel only because R&W had not received instructions on who new counsel for the family would be.  Watson also told the

33

State Court that Luz had the authority to speak on behalf of the Chavez Family throughout the pendency of the case, but that Watson and R&W could take no position on enforcement of the settlement because R&W no longer represented the Chavez Family.

At the May 31 hearing, Edward (acting as ad litem) announced some modifications to the allocation of the settlement funds to minor Joel, which would be taken from the allocation to Darlene and Allen.  Edward advised the State Court that he and Adriana recommended the settlement on behalf of minor Joel as just and reasonable, with these modifications.  The State Court then orally granted the Motion to Enforce Settlement and directed counsel and the ad litem to agree on an ad litem fee to be included in the judgment reflecting the ruling.

Although Luz received notice of the May 31, 2011 hearing, neither Luz nor any other member of the Chavez Family attended the hearing.  Instead of attending, Luz sent a letter dated May 18, 2011 to the State Court, requesting a continuance because she had yet to find new counsel.  (Ex. P-48).  Luz also filed a Motion for Continuance with the State Court on May 31, 2011, where Luz stated that she "had to wait until the hearing in April to tell you in person that I did not want this settlement. I also had to wait to tell you that I did not agree to this because I did not trust the Rosenthal firm or the Brownsville lawyer for my youngest son, Joel."  PTO (dkt# 98, p. 16).

Luz followed this up with a Motion for Reconsideration dated June 2, 2011 addressed to the State Court.  (Ex. P-49).  Through this motion, Luz requested that the State Court reconsider its May 31, 2011 ruling that enforced the KCSR settlement.  This motion, signed by Luz, is riddled with inaccurate factual statements.  In response to this request by Luz, the State Court apparently set a rehearing on the Motion to Enforce

Settlement Agreement filed by KCSR for June 23, 2011.

On June 15, 2011, Watson, on behalf of R&W, sent the State Court a letter, and provided a copy to Luz and other counsel. (Ex. P-39). This letter was sent by Watson to the State Court primarily as a response to Luz's accusations that R&W promoted a settlement without authority. In the letter, Watson stated that "Luz Chavez did agree, on behalf of all Plaintiffs, to the settlement, and the settlement agreement was reached based on the informed consent of Luz Chavez." Watson stated that she was "mindful of the lawyer's duties to a client concerning confidentiality," but the circumstances fell into "the category of situations in which a lawyer may (and in some instances, must) divulge otherwise confidential information." Watson consulted with ethics counsel before sending this letter.

On June 23, 2011, the State Court conducted a rehearing on the Motion to Enforce Settlement filed by KCSR, in response to Luz's request. (Ex. P-44). Watson of R&W attended this hearing by phone. Adriana (as ad litem for minor Joel) and Clements (counsel for KCSR) appeared in person. Luz did not attend this hearing, although several attempts were made to notify her of the hearing. The State Court noted that the hearing was set for the benefit of Luz so that she could have an opportunity to hire a new law firm and make any additional arguments or statements to the court. Understandably, the State Court appeared frustrated that Luz did not show up to a rehearing set for her benefit.

At this hearing, Watson reiterated to the State Court that R&W had been terminated as counsel. Watson also advised the State Court that Luz gave consent to the settlement on behalf of all plaintiffs, as stated in her June 15 letter to the State Court. Ultimately, the State Court agreed with the previous recommendations of the co-

guardians ad litem that the settlement was in the best interests of minor Joel, and again granted the Motion to Enforce the Settlement filed by KCSR.

At the conclusion of the June 23, 2011 hearing, the State Court signed an Order Granting Motion to Enforce Settlement Agreement and Final Judgment Reflecting Terms of Settlement Agreement ("First Judgment"). (Ex. P-35). The First Judgment provided that the Chavez Family recover $531,000 from KCSR and apportioned the recovery as set forth in the Dean Letter, except that minor Joel's allocation was increased by $10,000 to $56,000 and Darlene's and Allen's allocation was reduced by $5,000 to $41,000 each. The First Judgment also recited that Edward and Adriana had been appointed as co-guardians ad litem for minor Joel.

On July 25, 2011, a Motion for New Trial was filed with the State Court by Luz on behalf of "Luz Chavez et al." (Ex. P-19). While this motion purported to be filed on behalf of all members of the Chavez Family, it was signed only by Luz. The motion requested that the State Court set aside its First Judgment and order a new trial. The State Court did not grant this motion.

An affidavit signed by Luz on July 25, 2011 was filed with this motion. (Ex. P-8). Luz's affidavit contains several inaccuracies as to factual events. Luz stated in her affidavit that R&W was hired to represent her family and that "I did not agree to settle our lawsuit against the railroad, and I have always been the person that the law firm contacts for decisions on the case." Luz further stated in the affidavit that she had spoken with Darlene and Allen, and that "they did not agree to settle the case against the railroad, either."

Affidavits signed by Darlene and Allen on July 25, 2011 were filed concurrently

with this motion. (Ex. P-12). In her affidavit, Darlene stated that she did not agree to settle the suit against KCSR and that she did not give R&W her consent to settle. Likewise, in his affidavit, Allen stated that he did not agree to settle the suit against KCSR and that he did not give R&W his consent to settle. Both Darlene and Allen have consistently and credibly maintained this position—that neither of them gave their consent to R&W to settle their individual claims—through trial in this adversary proceeding.

On August 31, 2011, Francisco (an elderly member of the Chavez Family and a party) passed away.

First Appeal/First Remand (2012-2014)

The Chavez Family appealed the First Judgment enforcing the 2010 settlement to the San Antonio Court of Appeals, where it was assigned cause no. 04-11-00697-CV ("First Appeal"). Appellants' Brief was signed only by Luz, purporting to act on her own behalf as well as the entire Chavez Family. (Ex. P-12). Appellants' Reply Brief was filed and signed by Alvarado, as attorney for the Chavez Family. (Ex. P-13). Alvarado also filed a Motion for Substitution of Counsel with the State Court on May 7, 2013, whereby Alvarado formally substituted as counsel for the Chavez Family in place of R&W in the State Court. (Ex. P-14).

On November 7, 2013, R&W filed a Petition in Intervention with the State Court. In this pleading, R&W sought recovery of the 40% contingency fee and over $400,000 in reimbursable expenses from the Chavez Family pursuant to the attorney's lien created in the Engagement Contract.

On February 13, 2013, the San Antonio Court of Appeals issued its Opinion in the First Appeal. *Chavez v. Kansas City S. Ry. Co.*, 522 S.W.3d 468 (Tex. App—San Antonio

2013, pet. denied) ("*Chavez I*"). The Court of Appeals reversed the First Judgment of the State Court enforcing the settlement against the Chavez Family and remanded to the State Court. In sum, the Court of Appeals found that because the Dean Letter had not been filed as part of the record with the State Court as required by Rule 11 of the Texas Rules of Civil Procedure, the Dean Letter could not be enforced. The Court of Appeals found it unnecessary to address the other issues raised by the Chavez Family in the appeal. *Chavez I,* 522 S.W.3d at 471.

On remand to the State Court, KCSR filed the Dean Letter of record under Rule 11 with a counterclaim against the Chavez Family, which again sought to enforce the 2010 settlement. On November 13, 2013, KCSR filed a Motion for Summary Judgment and Motion to Affirm Approval of Minor's Settlement and Adopt it as the Judgment of the Court ("Motion for Summary Judgment") with the State Court, which included the Dean Letter. (Ex. P-50).

On February 6, 2014, the State Court held a hearing on the Motion for Summary Judgment filed by KCSR and granted the motion by Order on the same date. (Ex. P-11). On February 13, 2014, the State Court corrected an error in such Order by entering a Judgment Nunc Pro Tunc ("Second Judgment"), which granted the Motion for Summary Judgment and enforced the 2010 settlement. The Second Judgment provided that the Chavez Family recover $541,000 from KCSR and apportioned the recovery as set forth in the Dean Letter (as modified by the minor settlement in the First Judgment), except that the allocation for Darlene and Allen was restored to $46,000 each.

On February 26, 2014, R&W filed a voluntary bankruptcy petition under Chapter 7. Shortly thereafter, the Trustee was appointed for the R&W bankruptcy estate.

In April 2014, Celia (an elderly member of the Chavez Family and a party) passed away.

Second Appeal/Second Remand (2015-2017)

The Chavez Family appealed the Second Judgment enforcing the 2010 settlement to the San Antonio Court of Appeals, where it was assigned cause no. 04-14-00354-CV ("Second Appeal").

On June 17, 2015, the San Antonio Court of Appeals issued its Opinion in the Second Appeal.  *Chavez v. Kansas City S. Ry. Co.*, 518 S.W.3d 33 (Tex. App—San Antonio 2015) ("*Chavez II*").  This time, the Court of Appeals affirmed the summary judgment and Second Judgment in favor of KCSR against the Chavez Family enforcing the 2010 settlement.  In sum, the Court of Appeals found that there was a presumption that Dean had authority to bind the Chavez Family to the settlement as their attorney of record and the Chavez Family did not produce any summary judgment evidence raising a fact issue that Dean lacked the authority to enter into a settlement.  Accordingly, the Court of Appeals found that KCSR proved as a matter of law that Dean possessed actual authority to bind the Chavez Family to the settlement.  *Chavez II,* 518 S.W.3d at 43-45.

Undeterred, the Chavez Family sought review by the Texas Supreme Court, which was granted.  On May 16, 2017, the Texas Supreme Court issued a per curiam Opinion, which reversed the Court of Appeals.  *Chavez v. Kansas City S. Ry. Co.*, 520 S.W.3d 898 (Tex. 2017) ("*Chavez III*").  In sum, the Texas Supreme Court reversed the summary judgment enforcing the settlement because KCSR did not prove as a matter of law that Dean had authority to bind the Chavez Family to a settlement.  *Chavez III*, 520 S.W.3d at 900-01.

Addressing the issue in the context of summary judgment, the Texas Supreme

Court in *Chavez III* stated:

> Assuming without deciding that an attorney retained for litigation is presumed to possess express authority to enter into a settlement agreement on behalf of the client, the presumption may be rebutted with evidence to the contrary . . . [To be entitled to summary judgment] the Railway was required to establish affirmatively that there was no genuine issue of material fact that Chavez's [11] law firm was authorized to execute the settlement agreement—that is, that Chavez could not produce evidence to rebut a presumption of authority.  The Railway did not meet this burden.  It only produced evidence that Chavez hired counsel to represent her in this litigation and that those lawyers agreed to the settlement.  Although this is some evidence to satisfy its burden, the Railway was required to provide evidence that Chavez actually authorized her counsel to enter into a settlement agreement on her behalf.  Because the Railway failed to conclusively establish each element of its claim, the summary judgment must be reversed.

*Chavez III*, 520 S.W.3d at 900-01.

<u>Severance and Removal (2017-2018)</u>

Following remand from the Texas Supreme Court, on September 5, 2017, the

State Court severed the breach of contract counterclaim by KCSR to enforce the 2010

settlement against the Chavez Family from the underlying wrongful death suit filed by the

Chavez Family against KCSR.  The severed breach of contract suit to enforce the 2010

settlement was assigned cause no. 2017-CVA-002223-D4 by the State Court (herein

"<u>Severed Suit</u>").  In the Severed Suit, KCSR is designated as plaintiffs and the Chavez

Family are designated as defendants.

Numerous hearings and discovery disputes were conducted and adjudicated by

the State Court in the Severed Suit.  On August 31, 2018, the Chavez Family filed a third-

---

[11] The Texas Supreme Court defined the entire Chavez Family plaintiffs as "Chavez" in its Opinion. *Chavez III,* 520 S.W.3d at 899.

party petition and crossclaim against R&W in the Severed Suit pending in State Court. In this pleading, the Chavez Family alleged claims against R&W for breach of fiduciary duty, negligent misrepresentation, civil conspiracy, and perjury.

On October 1, 2018, the Trustee (on behalf of the R&W bankruptcy estate) removed the Severed Suit from State Court to this Court, where it became this adversary proceeding no. 18-01091 (dkt# 1). The Severed Suit removed to this Court encompassed all claims and defenses asserted in the Severed Suit for breach of contract previously pending in State Court, including the claims of KCSR, the counterclaims by the Chavez Family against KCSR, and the third-party claims by the Chavez Family against R&W.

### D. **Specific Subject Matters**

With respect to specific subject matters, the following are additional findings of fact by the Court after weighing all the evidence and the credibility of all witnesses.

<u>Authority of Luz to Settle as Agent for Other Adult Clients</u>

The Court finds that Luz did not have authority as an agent for the other four adult members of the Chavez Family to accept a settlement on their behalf in the September 28, 2010 phone call with Watson.

Initially, the Court has examined the conduct and communications of the adult members (the principals) to Luz (their alleged agent) to determine if Luz had actual authority to settle their claims of the other adults. Darlene and Allen were not aware of the 2010 settlement offer when it was made to Luz and never consented to any settlement of their individual claims. Darlene testified that Luz did not have authority to act for her in all aspects of the case. Darlene and Allen did not allow Luz to believe that Luz had authority to finally settle their individual claims in September 2010 without their specific

consent. The evidence did not establish that Darlene and Allen intentionally or negligently conferred authority on Luz to settle their individual claims without their specific consent. There was no credible evidence that Francisco and Celia (Luz's in-laws and individual claimants) took any actions that could be construed as providing actual authority to Luz to settle on their behalf.

None of these four adults (or Luz for that matter) ever contacted R&W or anyone else asking for their funds under the 2010 settlement. Luz also signed the same form of Engagement Letter as the other four adults, so Luz was charged with knowledge that the individual claims of the other four adults could not be settled without the consent and final approval of the other four adults. In sum, the Court finds that these four other adults did not give Luz actual authority to settle their claims.

Next, the Court has examined the conduct of these adult members (the principals) and the reasonableness of the assumption by Watson that Luz (the alleged agent) had the apparent authority to settle the claims of the other adults. Darlene testified that in the past, Watson of R&W would contact each of them individually when any "big topic" in the case came up. Allen testified that in the past, he was present and making settlement decisions at mediations with R&W as his counsel. Darlene and Allen did not knowingly permit Luz to hold herself out as having authority to finally settle their individual claims. There was no credible evidence that Francisco and Celia (Luz's in-laws) took actions that could be construed as providing apparent authority to Luz to settle on their behalf.

By permitting Luz to be the primary contact person for the family, the other adult members of the Chavez Family did not clothe Luz with the authority to unilaterally make the most important decision on their behalf in the suit—whether or not to settle their

individual claims and for how much.  During the September 2010 phone call, Watson did not ask Luz if she had the authority to accept the KCSR settlement offer (with the allocations created by Rosenthal) on behalf of the other adults.  Watson did nothing to ascertain the scope of Luz's authority to act for the other adults during the phone call.  It was not reasonable for Watson to assume that just because Luz was the primary contact person for the family, Luz could automatically settle the individual claims of the other adult family members without their specific consent.

The evidence suggesting that Luz had actual or apparent authority from Darlene and Allen to accept a settlement offer for them came from the testimony of Watson.  On this critical point, Watson provided mostly vague and general testimony.  For example, at trial, Watson generally agreed with counsel's question that Darlene and Allen "confirmed" that Luz was the "voice of the family" when Watson spoke "to them, all jointly, on several occasions"; that Darlene and Allen "always deferred" and then "usually deferred" to Luz's decisions in the case; and that Darlene and Allen always "indicated" that Luz had authority to speak on their behalf.  (TR at pp. 16-18, 69; dkt# 131).  Watson's deposition testimony was similar—often responding "yes" to questions about Allen and Darlene with little specifics or detail other than general statements about authority.  (Ex. JT-1, Tab 10, pp. 19-20, 23, 143-4, 156-7).  However, none of Watson's detailed case notes (or other writings) support Watson's generalized testimony that Darlene and Allen had previously agreed that Luz had their authority to settle their individual claims.  (Ex. P-4).

To the Court, Watson appeared to be carefully stretching her testimony to try and justify her actions after the fact.  At the time of the September 28, 2010 phone call with Luz, Watson and R&W were under pressure as a November 15, 2010 trial date was

looming. R&W was beginning to experience financial difficulty as part of the fallout from the federal investigation of Rosenthal. R&W had no desire to retry an expensive suit against KCSR that was lost the first time. KCSR had made a reasonable settlement offer under the circumstances, an offer that Watson felt her clients should accept and would recoup some of R&W's significant expenses. When Watson was finally able to chase down Luz on the phone, Watson managed to get Luz to verbally agree to the settlement.

At that time, Watson figured that the other four adult clients would just go along with Luz and ultimately agree to the KCSR settlement offer, so Watson never even tried to meet or speak to her other adult clients about the settlement offer. Later, when Luz disavowed the settlement and the other adult clients refused to give their consent to the settlement, Watson was forced to stretch and justify the settlement by taking the position that Luz had authority to settle the claims of the other adult clients as well. Further, even if the Court were to accept Watson's generalized testimony that the other adults agreed that Luz was the voice for the family, this does not establish that the scope of authority granted to Luz included settling the individual claims of the other adults without their knowledge and specific consent.

The Court recognizes that several months after the September 2010 phone call with Watson, Luz signed an affidavit stating that "I have always been the person that the law firm contacts for decisions on the case." (Ex. P-8). [12] However, actual authority cannot be based solely on the words of an agent (Luz). And in determining apparent

---

[12] Luz, acting *pro se*, also filed pleadings purportedly on behalf of the entire Chavez Family. (Exs. P-12, P-19). These pleadings, as well as the affidavit of Luz, are not dispositive as to whether Luz was an agent with authority to accept a settlement offer for the other adults back in the September 2010 phone call with Watson. The pleadings and affidavit were filed many months (and sometimes years) after the critical September 2010 phone call with Watson.

authority, only the conduct and acts of the principals (not the agent Luz) are examined. Further, this same affidavit signed by Luz stated that Darlene and Allen (two of the principals) did not agree to settle the suit against KCSR.

No writings exist whereby Darlene, Allen, Francisco or Celia gave authority to Luz to settle their individual claims. The only writings on authority to settle claims are the Engagement Contracts, signed by Watson herself for R&W and by Darlene, Allen, Francisco, and Celia individually. Each Engagement Contract specifically states that R&W may not settle "MY" claims without "MY" consent and "my" final approval. (Ex. CD-5).

After weighing all the evidence and considering the credibility of all witnesses, the Court finds, as a factual matter, that Luz did not have actual or apparent authority as agent for the other adult members of the Chavez Family to accept a settlement on their behalf during the September 2010 phone call with Watson.

Barratry

When the Chavez Family retained R&W in February 2007, they had not hired any other lawyer or firm to represent them in their claims against KCSR. The credible and probative evidence did not prove that in February 2007 a non-attorney associated with R&W solicited a relative of the Chavez Family to hire R&W as counsel for the Chavez Family. It was not established that R&W paid or caused to be paid $10,000 to a non-attorney to secure the Chavez Family as clients by credible evidence.

At the first meeting in February 2007, relatives of Luz asked R&W if they could pay some funds to Luz (who was recently widowed and raising a small child) for living expenses while the case proceeded to trial. In response, R&W agreed to this request,

and ultimately advanced $10,000 and $2,000 monthly to Luz for living expenses. The $10,000 was not advanced by R&W to Luz for the purpose of soliciting employment of R&W by the Chavez Family. [13]

R&W Expenses

As of September 28, 2010, R&W had incurred $416,724 in out-of-pocket expenses relating to the wrongful death suit filed against KCSR, including advances made directly to the Chavez Family of about $64,000. As of November 10, 2010, R&W had incurred out-of-pocket expenses on behalf of the Chavez Family in the prosecution of the wrongful death suit against KCSR totaling $417,622. [14]

The Court specifically finds that the $417,622 in out-of-pocket expenses of R&W are actual, necessary, and reasonable expenses incurred by R&W in the prosecution of the wrongful death suit against KCSR and are within the scope of reimbursable expenses in the Engagement Contracts. The expenses included the cost of multiple experts, reports, research, investigation, depositions, discovery, travel, and jury trial in the complex wrongful death suit. (Ex. P-38). Indeed, the witnesses at trial in this adversary proceeding (including current counsel for the Chavez Family) testified that such expenses were incurred by R&W and were reasonable. At the time the Engagement Contracts were signed, the Chavez Family understood that R&W would be reimbursed for its expenses

---

[13] The Court analyzes the evidence with respect to barratry in more detail in its conclusions of law.

[14] The Court notes that the factual stipulations by the parties in the PTO have slightly different numbers for R&W's expenses as of November 15, 2010. *See* PTO (dkt# 98, ¶¶ 53, 87). The Chavez Family and the Trustee have also stipulated that if the 2010 settlement in the Dean Letter is enforced by the Court, R&W's expense recovery would be limited to $325,000 (the amount set forth in the Dean Letter). *See* PTO (dkt# 98, ¶ 87 n.1)

out of any recovery against KCSR, whether by judgment or settlement.

KCSR Performance/Authority

KCSR has been and remains ready, willing, and able to perform the 2010 settlement, as reflected in the Dean Letter as modified by the Second Judgment. KCSR is holding such settlement funds in reserve for the Chavez Family. The settlement funds have not been paid to date as it would be a useless act, because the Chavez Family has denied that any enforceable settlement exists. The filing of suit to enforce the settlement against the Chavez Family has been duly authorized by KCSR.

Lloyds workers' compensation lien

Lloyds is the workers' compensation carrier for Rental Xpress, the employer of Sr and Jr at the time of the fatal train accident. (Ex. D-44). Since the accident and through October 2019, Lloyds has paid workers' compensation benefits totaling $373,737 to Luz and Joel. Luz continues to receive weekly benefits of $392. (Ex. P-51).

Lloyds asserts a statutory subrogation lien under the Texas Labor Code for benefits it has paid to Luz and Joel ($373,737) and will continue to pay to Luz, up to the amount that Luz and Joel may recover from KCSR. (Ex. P-51). By the time the Second Judgment was entered by the State Court in February 2014 enforcing the 2010 settlement reflected in the Dean Letter, Lloyds had agreed to accept the $61,333 allocated to Lloyds for its workers' compensation lien against the recovery by Luz and Joel under the settlement. Recently, Lloyds has notified counsel for the Chavez Family and KCSR that Lloyds will continue to honor its previous agreement to accept $61,333 for its lien if this Court enforces the settlement reflected by the Second Judgment. On the other hand, if the settlement is not enforced by this Court and the wrongful death suit continues forward,

47

Lloyds has advised counsel for the parties that it will not abide by its previous agreement to limit its lien against any recovery by Luz and Joel. (Ex. P-51).

## IV.
## CONCLUSIONS OF LAW

The following constitutes the conclusions of law with legal analysis by the Court in this adversary proceeding.

### A. Enforcement of Settlement/Breach of Contract

KCSR seeks specific performance and enforcement of the 2010 settlement agreement reflected by the Dean Letter (with the settlement for the minor Joel approved by the State Court) against the Chavez Family, based on breach of contract. *See* KCSR Complaint (dkt# 18). Likewise, on behalf of the R&W estate, the Trustee seeks specific performance and enforcement of the 2010 settlement agreement against the Chavez Family, based on breach of contract. *See* Trustee Counterclaims (dkt# 56). The Chavez Family has asserted a plethora of defenses to the enforcement of the 2010 settlement. *See* Chavez Answer (dkt# 50-1).

For the multiple and independent reasons set forth below, the Court concludes that KCSR and the Trustee are not entitled to enforce the 2010 settlement against the Chavez Family by specific performance.

(1) Unauthorized Settlement on Behalf of Other Adult Clients of Chavez Family

The Court concludes that the 2010 KCSR settlement reflected by the Dean Letter may not be enforced by specific performance against Darlene, Allen, Francisco and Celia (the other adult client members of the Chavez Family). In short, these other adults did not authorize or provide consent to the settlement of their individual claims, as set forth below.

48

Under Texas law, if the evidence shows that an attorney did not have the authority of a client to enter into a settlement agreement, the settlement will not be enforced against the client.  *See, e.g.*, *Karle v. Innovative Direct Media Ltd. Co.*, 309 S.W.3d 762, 765-66 (Tex. App.—Dallas 2010, no pet.) (citing *Cleere v. Blaylock*, 605 S.W.3d 294, 296-97 (Tex. Civ. App.—Dallas 1980, no writ)); *Ebner v. First State Bank of Smithville*, 27 S.W.3d 287, 300 (Tex. App.—Austin 2000, pet. denied) (supporting citations omitted).  Settlement of a suit by an attorney without the knowledge or consent of a client is an unauthorized act, and an unauthorized settlement agreement will be set aside.  *See Johnson v. Rancho Guadalupe, Inc.*, 789 S.W.2d 596, 598 (Tex. App.—Texarkana 1990, writ denied) (supporting citations omitted).  The employment of counsel does not "clothe" counsel with authority to settle a suit "without the specific consent of the client."  *Breceda v. Whi*, 187 S.W.3d 148, 152 (Tex. App.—El Paso 2006, no pet.) (citing *Sw. Bell Tel. Co. v. Vidrine,* 610 S.W.2d 803, 805 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)).

Although some Texas courts have held that an attorney "retained for litigation" is presumed to possess actual authority to enter into a settlement on behalf of a client, this presumption is rebuttable.  *See, e.g.*, *City of Roanoke v. Town of Westlake*, 111 S.W.3d 617, 629 (Tex. App.—Fort Worth 2003, pet. denied). [15]  A court will indulge every reasonable presumption to support a settlement agreement made by a "duly employed attorney," but when the evidence shows that the attorney did not have the client's authority to agree, the settlement agreement will not be enforced.  *Ebner*, 27 S.W.3d at 300

---

[15] In *Chavez III*, the Texas Supreme Court "assum[ed] without deciding" that an attorney retained for litigation is presumed to have authority to enter into a settlement agreement, but recognized that if there is such a presumption, it may be rebutted. 520 S.W.3d at 900.

(supporting citations omitted). [16]

Here, the 2010 settlement sought to be enforced by KCSR and the Trustee against the Chavez Family is set forth in the Dean Letter. (Ex. P-1). Dean sent this settlement letter purportedly as counsel for all members of the Chavez Family to counsel for KCSR. It is undisputed that Dean did not have authority directly from any of the Chavez Family to send this settlement letter; instead, Dean relied upon Watson of R&W to obtain authority from each of the client members of the Chavez Family to the settlement set forth in the Dean Letter.

The only Chavez Family client that Watson discussed the 2010 settlement with was Luz, in one phone call on September 28, 2010. As a factual matter, the Court has already found that Luz **did not** accept the settlement offer on behalf of Darlene, Allen, Francisco, and Celia (the other adult clients in the Chavez Family) in that phone call with Watson. Luz only accepted the offer on behalf of herself. It is undisputed that Watson never discussed the 2010 settlement with these other adult clients to obtain their consent to the settlement. As a result, for this reason standing alone, the 2010 settlement reflected in the Dean Letter is not enforceable against Darlene, Allen, Francisco and Celia—because the evidence showed that these four adult clients never authorized the settlement of their individual claims as set forth in the Dean Letter.

Even if Luz did accept the 2010 settlement offer on behalf of the other adult

---

[16] It is doubtful whether these presumptions even apply in this adversary proceeding, as explained in more detail below. Regardless of whether such presumptions apply here, the Court finds that the evidence demonstrated that Dean and R&W did not have authority and consent of the other adult family clients (Darlene, Allen, Francisco and Celia) to settle their individual claims as reflected in the Dean Letter.

members of the Chavez Family in the phone call with Watson (contrary to the Court's factual finding), the Court concludes that Luz did not have authority to accept the KCSR settlement offer on behalf of the other adult members. In this regard, KCSR and the Trustee contend that Luz was the "agent" for the other adult family members, with the actual or apparent authority to accept the settlement on behalf of these other adults.

Recently, the Fifth Circuit examined the two types of agency authority under Texas law, which are "actual authority" and "apparent authority." *Russell v. Russell (In re Russell),* 941 F.3d 199, 204-05 (5th Cir. 2019). Absent actual or apparent authority, an agent cannot bind a principal under Texas law. *Russell*, 941 F.3d at 204 n.3 (supporting citations omitted). Texas law does not presume agency in a non-attorney client relationship; it must be proven by the party alleging an agency relationship. *See, e.g., Lifshutz v. Lifshutz*, 199 S.W.3d 9, 22 (Tex. App.—San Antonio 2006, pet. denied) (supporting citations omitted).

Actual authority is authority that the principal "intentionally conferred on the agent or allowed the agent to believe was conferred." *Russell*, 941 F.3d at 204 (citing *Ebner*, 27 S.W.3d at 300). Such authority "is created through the written or spoken words or conduct of the principal communicated to the agent." *CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 899 (Tex. App.—Dallas 2007, pet. denied) (citing *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 550 (Tex. App.—Houston [14th Dist.] 2003, no pet.)). Actual authority cannot be based merely on the words or deeds of the agent. *CNOOC Se. Asia Ltd.*, 222 S.W.3d at 889.

Apparent authority under Texas law is based on estoppel. *Gaines v. Kelly*, 235 S.W.3d 179, 183 (Tex. 2007) (citing *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d

945, 948 (Tex. 1998)). Apparent authority arises in two situations: (1) from a principal knowingly permitting an agent to hold the agent out as having authority; or (2) by a principal's actions, which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority the agent purports to exercise. *Gaines*, 235 S.W.3d at 183; *Russell,* 941 F.3d at 205. In determining apparent authority, a court may consider only the conduct and acts of the principal (not the agent). *Gaines*, 235 S.W.3d at 182; *Russell*, 941 F.3d at 204. The acts of the principal are examined to ascertain whether those acts would lead a reasonably prudent person using diligence and discretion to ascertain the agent's authority to act on behalf of the principal. *Gaines*, 235 S.W.3d at 182-83. In short, to determine an agent's apparent authority, the conduct of the principal and the reasonableness of the third party's assumptions about the agent's authority are examined. *Gaines,* 235 S.W.3d at 182-83.

Three limitations exist on the use of apparent authority of an agent to bind a principal under Texas law. First, and significant here, a principal is not bound when the third party had "notice of the limitations of the agent's power." *Russell,* 941 F.3d at 205 (citing *G.D. Douglass v. Pan., Inc.*, 504 S.W.2d 776, 779 (Tex. 1974)). Second, "a principal's full knowledge of all material facts is essential" to establish apparent authority. *Gaines,* 235 S.W.3d at 182 (supporting citations omitted). Third, a party dealing with an agent has a duty to ascertain both the fact and the scope of the agent's authority; and if the party deals with the agent without having made such determination, the party does so at its own risk. *Texas Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 353 (Tex. App.—Fort Worth 2007, pet. dism'd); *Suarez v. Jordan*, 35 S.W.3d 268, 272 (Tex. App.—

Houston [14th Dist.] 2000, no pet.).

The Court will now apply these agency rules in the context of the September 2010 phone call between Watson and Luz. In this framework, Luz is the "agent," the other adult members of the Chavez Family are the "principals," and Watson of R&W is the "third party."

The Court has already found, as a factual matter, that Luz did not have the actual authority as an agent for the other adult Chavez Family members to accept a settlement offer on their behalf. The Court has examined the conduct and communications of the other adults (the principals) to Luz (the alleged agent) in making this determination, as set forth in detailed factual findings.

Although a slightly closer call, the Court has also found, as a factual matter, that Luz did not have the apparent authority as an agent for the other adult Chavez Family members to accept a settlement on their behalf. In this respect, the Court has examined the conduct and actions of the other adults (the principals) and the reasonableness of the assumptions by Watson (the third party) about the authority of Luz (the alleged agent), as set forth in detailed factual findings.

Just as importantly, the doctrine of apparent authority cannot be used to establish that Luz was the agent of the other adult members for the purpose of accepting the KSCR settlement offer on their behalf. As recognized by the Fifth Circuit, a principal is not bound when the third party had "notice of the limitations on the agent's power." *See Russell,*

941 F.3d at 205 (applying Texas law). [17]

Here, Watson of R&W (the third party) had notice of a limitation on Luz's power (as agent) to accept a settlement offer on behalf of the other adult family members (the principals). The limitation is specifically set forth in the Engagement Letter signed by Watson of R&W with each of the other adult family members, as clients. The Engagement Letter provides, in all capitalized letters, that "NO SETTLEMENT OF MY SAID CLAIMS WILL BE MADE BY ATTORNEYS [R&W] WITHOUT MY CONSENT." The Engagement Letter further provides that R&W "shall neither settle or compromise this matter without my final approval." (Ex. CD-5). The repeated use of the word "my" in the Engagement Letter makes this limitation crystal clear and unequivocal—the claims of the other adult family members could not be settled without each individual adult providing R&W their own consent and final approval to the settlement.

For these reasons, the Court concludes that the 2010 KCSR settlement reflected by the Dean Letter cannot be enforced by specific performance against Darlene, Allen, Francisco and Celia (the other adult client members of the Chavez Family) because they did not authorize or approve the settlement of their claims.

(2) Unauthorized Settlement by Dean as Attorney of Record

The Court also concludes that the 2010 settlement reflected by the Dean Letter cannot be enforced against any member of the Chavez Family. In short, Dean was not an authorized attorney of record for the Chavez Family, so Dean had no authority to settle

---

[17] In *Russell*, the Fifth Circuit reversed the bankruptcy court for this very reason—since the third party (David) had notice that the agent (Yarrell) was not authorized to collect a payment on behalf of the principal (Janna), the third party (David) could not rely on the apparent authority of the agent (Yarrell). The Fifth Circuit also stated that whether the agent (Yarrell) was the attorney of record for the principal (Janna) "makes no difference." 941 F.3d at 205.

the suit under Rule 11 through the Dean Letter, for the reasons set forth below.

KCSR and the Trustee seek to enforce the Dean Letter sent by Dean (purportedly as attorney for the Chavez Family) under Rule 11 of the Texas Rules of Civil Procedure. Rule 11 provides as follows:

> Unless otherwise provided in these rules, no agreement *between attorneys* or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.

TEX. R. CIV. P. 11 (emphasis added).

A Rule 11 agreement made by an attorney will not be enforced against a client, if the evidence shows that an attorney was not authorized to settle for the client. *Karle,* 309 S.W.3d at 765; *Ebner,* 27 S.W. 3d at 300. Although Texas courts have recognized certain rebuttable presumptions regarding an attorney's authority to enter into a Rule 11 agreement for a client, the attorney must be "retained for litigation" and must be "duly employed" by the client for these presumptions to arise. *See, e.g., City of Roanoke,* 111 S.W.3d at 629 (an attorney "retained for litigation" is presumed to possess authority to enter into a Rule 11 agreement on behalf of a client, although the presumption is rebuttable); *Ebner*, 27 S.W. 3d at 300 (courts indulge every reasonable presumption to support a Rule 11 settlement agreement made by a "duly employed attorney," although the presumption is rebuttable).

An attorney that enters an appearance for a party is presumed to be authorized to do so, unless it is conclusively shown that the attorney was not authorized to appear for the party. *Grey v. First Nat. Bank in Dallas*, 393 F.2d 371, 384 n.17 (5th Cir. 1968) (applying Texas law) (supporting citations omitted); *West v. City Nat'l Bank of Birmingham*, 597 S.W.2d 461, 463 (Tex. Civ. App.—Beaumont 1980, no writ). The

"longstanding rule in Texas" is that a party is not bound by the acts of an attorney if the party rebuts this presumption and demonstrates that an attorney was not authorized to act on behalf of the party. *Latter and Blum of Texas, LLC v. Murphy*, No. 02-17-00463-CV, 2019 WL 3755765, at *8 (Tex. App.—Fort Worth Aug. 8, 2019, pet. filed) (mem. op.) (citing *Merritt v. Clow*, 2 Tex. 582, 588 (1847); *Levy v. Roper*, 230 S.W. 514, 516 (Tex. Civ. App.—San Antonio 1921), *modified*, 256 S.W. 251 (Tex. 1923)).

Texas law presumes that an attorney has authority to sign pleadings on behalf of a client; however, "an attorney does not have authority to act on behalf of a purported client if the purported client did not hire the attorney to represent him." *Maiz v. Virani*, 311 F.3d 334, 341 n.5 (5th Cir. 2002) (citing *Grey*, 393 F.2d at 384 n.17 (5th Cir. 1968)). It is "hornbook law that no person has the right to appear as attorney for another without first receiving authority from the purported client." *Maiz*, 311 F.3d at 341 n.5 (citing *Dev. Disabilities Advocacy Ctr. v. Melton*, 521 F. Supp. 365, 372 (D.N.H. 1981), and the United States Supreme Court in *Pueblo of Santa Rosa v. Fall*, 273 U.S. 315 (1927)). It is settled law in Texas that ordinarily an attorney employed by a client in a suit (here, R&W) is a special agent and does not have blanket authority to employ other counsel (here, Dean) to assist the attorney in the suit or to settle the suit. *See State Life Ins. Co. v. Duke*, 69 S.W.2d 791, 793 (Tex. Civ. App.—San Antonio 1934, writ ref'd).

An attorney-client relationship is contractual under Texas law. *SMWNPF Holdings, Inc. v. Devore,* 165 F.3d 360, 364-65 (5th Cir. 1999) (citing *Yaklin v. Glusing, Sharpe & Krueger*, 875 S.W.3d 380, 383 (Tex. App.—Corpus Christi, no writ); *Parker v. Carnahan*, 772 S.W.2d 151, 156 (Tex. App.—Texarkana 1989, writ denied)). Both the client and the attorney must understand and mutually agree to "the nature of the work to be

56

undertaken.'" *SMWNPF Holdings,* 165 F.3d at 364-65 (quoting *Parker*, 772 S.W.2d 151 at 156).   The parties must explicitly or by their conduct manifest an intent to create an attorney-client relationship.   *LeBlanc v. Lange*, 365 S.W.3d 70, 79 (Tex. App.—Houston [1st Dist.] 2011).   The determination of whether a contract exists that creates an attorney-client relationship is based on an objective standard of what the parties said and did.   *LeBlanc*, 365 S.W.3d at 79 (citing *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 105 S.W.3d 244, 254 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)).   One party's subjective belief that a relationship was formed is not sufficient to form an attorney-client relationship.   *LeBlanc*, 365 S.W.3d at 79; *SMWNPF Holdings*, 165 F.3d at 364.

The Court will now apply these legal principles to the basic facts in this case.  Here, the evidence showed that the Chavez Family never hired or retained Dean as their attorney in the wrongful death suit.  Instead, the Chavez Family hired the R&W law firm to be their attorneys.  R&W, on the eve of trial, associated Dean to make an appearance and try the wrongful death suit for the Chavez Family—without consulting with or the consent of the Chavez Family.  As a result, because Dean was not "retained for litigation" or "duly employed" by the Chavez Family (the clients) in the wrongful death suit, there is not even a legal presumption that Dean had authority to settle the suit and enter into a Rule 11 agreement (the Dean Letter) for the Chavez Family.

R&W unilaterally filed a Notice of Appearance with the State Court adding Dean as counsel of record for the Chavez Family about a week before the jury trial started in the wrongful death suit.  It was conclusively shown that this Notice of Appearance was filed for Dean without the authorization or approval of the Chavez Family.  It was conclusively shown that the Chavez Family never hired Dean and did not authorize his

appearance or his engagement in the suit as their attorney.  The Notice of Appearance for Dean was filed without discussing or notifying the Chavez Family, and the family was completely unaware that R&W had associated Dean when it was filed.  R&W did not have authority from the Chavez Family to employ and associate Dean to represent the Chavez Family in the suit.  As a result, under Texas law, since Dean was not authorized by the Chavez Family (the clients) to appear on their behalf as attorney of record in the wrongful death suit, the Chavez Family is not bound by Dean's act in settling the suit through entering into a Rule 11 agreement for the Chavez Family.

Under the circumstances, the Court also concludes that no attorney-client relationship existed between Dean and the Chavez Family.  There is no written agreement between the Chavez Family and Dean, so the conduct of both parties must be examined to determine if an attorney-client relationship existed.  Dean appeared at the jury trial and a few hearings at the request of the R&W, not the Chavez Family.  Dean could not specifically recall ever meeting with any member of the Chavez Family.  The subjective belief by one party (Dean) that he was an attorney for the Chavez Family is insufficient under Texas law to create an attorney-client relationship.

The first time that any member of the Chavez Family even heard of Dean was during the jury trial.  Outside the courtroom during trial, Watson of R&W told Darlene of the Chavez Family that Dean would be assisting R&W during the trial.  Darlene immediately told R&W that hiring Dean was not part of their agreement.  Some members of the Chavez Family (Luz and Darlene, and Allen when he was in attendance) saw Dean speaking on their behalf during the jury trial, as well as attorneys with R&W.  Other members of the Chavez Family (elders Francisco and Celia) did not attend the trial, so

58

they never even saw Dean.

Although none of the attending family members voiced any opposition to the judge during the jury trial about Dean acting as one of their attorneys, it would be unreasonable to expect any family member to jump up in the middle of a jury trial and interrupt the proceeding in that manner. [18]  Several attorneys with R&W participated in the trial together with Dean.

Dean also appeared at some post-trial hearings with R&W as attorney for the Chavez Family, but none of the family attended so they did not know that Dean was acting as their attorney at these post-trial hearings.  Likewise, months after the trial when Dean negotiated with KCSR counsel about a settlement of the suit, the Chavez Family were completely unaware that Dean was purporting to act as an attorney on their behalf.

The Court also concludes that there was not an understanding or agreement by the Chavez Family regarding the nature of the legal work to be undertaken by Dean. When viewed from an objective standpoint, there was not an attorney-client relationship between the Chavez Family and Dean under these circumstances.  As a result, and for this reason as well, the Court concludes that Dean had no authority to settle the suit and enter into a Rule 11 agreement (like the Dean Letter) for the Chavez Family as their attorney of record.

The only possible sources of authority for Dean to act as an attorney for the Chavez Family were the Engagement Contracts signed by the Chavez Family with R&W.  Each

---

[18]  The failure of some Chavez Family members to object on the record in the middle of a jury trial to Dean participating in a trial with R&W attorneys is too slender a reed to find that Dean had "apparent authority" to settle the suit for the Chavez Family under the circumstances.  *See* discussion of apparent authority, *supra*.

Engagement Contract between R&W and the Chavez Family provides, in pertinent part, as follows:

> I [each member of the Chavez Family] hereby *authorize Attorneys [R&W] and such other attorneys or law firms as Attorneys [R&W] in their sole discretion shall employ or associate in my behalf, to enter into settlement negotiations on my behalf* as Attorneys [R&W] deem appropriate, including Attorneys' prerogative to pursue cash and/or structured settlement negotiations. The Attorneys shall neither settle nor compromise this matter without my final approval . . .

(Ex. CD-5) (emphasis added).

For three independent reasons, the Court finds that this authorization in the Engagement Contracts for R&W to associate another attorney did not provide Dean with authority to appear as attorney of record for the Chavez Family in the wrongful death suit or to enter into a Rule 11 agreement (the Dean Letter) as counsel of record for the Chavez Family. [19]

First, the plain language of the Engagement Contracts does not grant R&W authority to associate another attorney (Dean) to appear in the wrongful death suit as attorney of record for the Chavez Family or to try the suit on behalf of the Chavez Family. Instead, the Engagement Contracts only authorize R&W to associate another attorney to "enter into settlement negotiations."  Since Dean was not authorized by the Chavez Family to appear and try the suit as their attorney of record, Dean did not have authority to enter into a Rule 11 agreement settling the suit on their behalf as their attorney of record.

Second, the Engagement Contracts contain only limited authorization—they

---

[19] Dean testified that he must have reviewed the Engagement Letter when R&W associated him as trial counsel.

authorize R&W to associate an attorney to "enter into settlement negotiations." This limited authorization does not authorize the associated attorney (Dean) to actually settle the suit, by entering into a binding Rule 11 settlement agreement as attorney of record for the Chavez Family in the suit. Further, the limited authorization to engage in settlement negotiations certainly does not authorize Dean to settle the suit without consent of the Chavez Family members (the clients).

Third, the Texas Disciplinary Rules of Professional Conduct (herein "Disciplinary Rules") limit the authority granted in the Engagement Contracts for R&W to associate Dean as an attorney, in the absence of the prior written consent of the Chavez Family. Dean entered into a fee-sharing arrangement with R&W (part contingency, part flat fee). In substance, the Disciplinary Rules required that R&W consult with the Chavez Family (their clients) **before** associating Dean and to obtain the written consent of the Chavez Family **before** employing and associating Dean.

In pertinent part, Rule 1.04 of the Disciplinary Rules provides as follows:

(f) A division or arrangement for division of a fee between lawyers who are not in the same firm may be made only if: . . .

(2*) the client consents in writing to the terms of the arrangement prior to the time of the association . . .* , including:

(i) the *identity of all lawyers* or law firms who will participate in the fee-sharing arrangement . . .

(g) *Every agreement that allows a lawyer or law firm to associate other counsel in the representation of a person*, . . . *and that results in such an association with . . . a different law firm or a lawyer in such a different firm, shall be confirmed by an arrangement conforming to paragraph (f).* Consent by a client or a prospective client without knowledge of the information specified in subparagraph (f)(2) does not constitute a confirmation within the meaning of this rule . . .

TEX. DISCIPLINARY RULES PROF'L CONDUCT ("DISCIPLINARY RULES") R. 1.04(f)-(g), *reprinted*

*in* TEX. GOV'T CODE, tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9) (emphasis added). [20]

The Comments to Disciplinary Rule 1.04, as well as the Rule itself, make clear that the client must be advised of the key features of the arrangement (including the identity of the associated lawyer) and that the client must consent in writing **before** the non-firm lawyer is associated by the law firm. DISCIPLINARY RULES R. 1.04 cmts. 15, 16. Here, it is undisputed that R&W associated Dean to act as an additional attorney for the Chavez Family without first consulting with the Chavez Family about Dean and without seeking or obtaining the prior written consent of the Chavez Family to the association of Dean.

Disciplinary Rule 1.04(g) could even be read to require prior client disclosure to associate a non-firm lawyer without fee sharing. *See* DISCIPLINARY RULES R. 1.04(g) ("Every agreement that allows a lawyer or law firm to associate other counsel in the representation of a person, . . . and that results in such an association with . . . a different law firm or a lawyer in such a different firm, shall be confirmed by an arrangement conforming to paragraph (f)"—which requires prior disclosure and consent by a client); *see also* State Bar of Texas Prof'l Ethics Comm., Op. 577 (Mar. 2007) (if a non-firm lawyer is working on a case without fee sharing, the name and identity of the non-firm lawyer must be clearly disclosed to the client); *Joyner v. Comm'n for Lawyer Discipline,* 102 S.W.3d 344, 347 (Tex. App.—Dallas 2003, no pet.) (attorney employed by client to file personal injury suit violated Disciplinary Rule 1.01(a) when attorney associated another

---

[20] Disciplinary Rule 1.04 became effective on January 1, 1990 and was amended effective March 1, 2005—well before the Engagement Letter was signed by R&W in February 2007 and before Dean was associated by R&W in November 2009.

attorney to work on suit without prior informed consent of client).

Regardless, the disclosure and prior client consent provisions of Rule 1.04 clearly apply here because R&W and Dean agreed to fee sharing—Dean would be paid part contingency and part flat fee for his work for the Chavez Family. [21]

For these multiple independent reasons, the Court concludes that the 2010 settlement reflected by the Dean Letter cannot be enforced against any member of the Chavez Family. In sum, Dean was not an authorized attorney of record for the Chavez Family, so Dean had no authority to settle the suit on their behalf under Rule 11 through the Dean Letter.

### (3) Impermissible Aggregate Settlement

The Chavez Family also contends that the 2010 settlement with KCSR is unenforceable because it was an impermissible "aggregate settlement." The Court agrees for the following reasons.

Texas courts describe an "aggregate settlement" as one in which an "attorney, who represents two or more clients, settles the entire case on behalf of those clients without individual negotiations on behalf of any one client." *Authorlee v. Tuboscope Vetco Int'l, Inc.*, 274 S.W.3d 111, 120 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *Arce v. Burrow*, 958 S.W.2d 239, 245 (Tex. App.—Houston [14th Dist.] 1997), *rev'd on other grounds*, *Burrow v. Arce*, 997 S.W.2d 229, 247 (Tex. 1999).

In Texas, attorneys are prohibited from entering into an aggregate settlement of claims made by their multiple clients, unless specific requirements are satisfied. In this

---

[21] A fee sharing arrangement is often used when the "fee is contingent and the division is between a referring or associating lawyer initially retained by the client and a trial specialist." Disciplinary Rules R. 1.04 cmt. 10.

regard, Disciplinary Rule 1.08(f) provides:

> A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, . . . unless *each client* has consented after consultation, including disclosure of the existence and nature of all the claims or pleas involved and of the nature and extent of the participation of each person in the settlement.

DISCIPLINARY RULES R. 1.08(f) (emphasis added).

In sum, Disciplinary Rule 1.08(f) imposes the following specific requirements on an attorney that represents multiple clients in an aggregate settlement:

(1) consent by *each of the clients* to the aggregate settlement; and
(2) prior to consent, consultation by the attorney with *each of the clients*, including
    (a) disclosure of all claims,
    (b) the nature of the claims involved, and
    (c) the nature and extent of participation of each settling person.

DISCIPLINARY RULES R. 1.08(f). [22] Put another way, an aggregate settlement is permissible only when the settling attorney discloses the terms of the aggregate settlement to each of his clients and obtains the consent of each of his clients to the settlement. *See Authorlee*, 274 S.W.3d at 120. Settling a case in mass without consent of all clients is unfair to the clients and may result in a benefit to the attorney (speedy resolution and payment of fees) to the detriment of the clients (decreased recovery). *Arce,* 958 S.W.2d at 245.

In *Authorlee*, the Court of Appeals determined that there was not an undisclosed and impermissible aggregate settlement for several reasons. The plaintiffs' attorney negotiated individual settlements for his multiple clients and sent each client a letter

---

[22] Disciplinary Rule 1.08 was adopted long before the 2010 settlement with KCSR. Rule 1.08 became effective on January 1, 1990 and was amended on October 23,1991. Its predecessor, Rule 5-106(a) of the Code of Professional Responsibility, is very similar to current Disciplinary Rule 1.08.

detailing a specific settlement offer. The plaintiffs' attorney obtained the signed authorization from each client to settle and acknowledging that each client's claims were negotiated with similar claims but not part of an aggregate settlement. After receiving the written authorization from each client, the plaintiffs' attorney then made a specific demand for each client on the defendant. When the defendant accepted an offer made for each plaintiff client, each client then signed a formal settlement and release agreement and an affidavit stating that each client has relied on his attorney's legal advice. *Authorlee,* 274 S.W.3d at 116-21. In stark contrast, with respect to the members of the Chavez Family, there were no individual negotiations at all and no specific settlement authorization from each client family member that even resembled the situation in *Authorlee*.

Here, R&W represented multiple clients in the wrongful death suit filed against KCSR. Five different members of the Chavez Family were clients of R&W, asserting eight different claims against KCSR. [23] The evidence showed that Dean (acting as counsel for all members of the Chavez Family) negotiated a settlement of the entire wrongful death suit with Clements (counsel for KCSR) without any individual negotiations on behalf of the different members of the Chavez Family. Clements made a lump-sum offer of $400,000, then $500,000, then $525,000, and ultimately $531,000 to Dean to settle the claims of all members of the Chavez Family. (Exs. D-17, P-24, P-25, P-26). Dean and R&W did not individually negotiate the claims of the different Chavez Family members with counsel for KCSR.

---

[23] The five adult Chavez Family members who were clients of R&W consisted of Luz, Darlene, Allen, Francisco and Celia. Luz brought claims on behalf of herself individually, as representative of the estate of her deceased husband Sr, as representative of the estate of her deceased son Jr, and as next friend of her minor son Joel.

Dean communicated the KCSR lump-sum offer to Rosenthal and Watson of R&W (at the time, $500,000). Rosenthal, by himself, allocated the $500,000 lump-sum settlement offer from KCSR among his multiple clients (the Chavez Family members) and R&W expenses. Watson then communicated the $500,000 offer and the allocation created by Rosenthal in a phone call to one Chavez Family client member—Luz. (Ex. P-4, p. 1). Watson and R&W did not discuss or disclose the $500,000 offer and Rosenthal's allocation with their other four adult clients (Darlene, Allen, Francisco, and Celia). R&W never consulted with each of these other four adult clients about the nature of the claims involved and the extent and participation of each settling member of the Chavez Family. R&W also never obtained the consent of these other four adult clients to the $500,000 settlement offer and the allocation between the Chavez Family members. [24]

As a result, the Court concludes that the 2010 settlement with KCSR was an impermissible aggregate settlement. R&W and Dean did not consult with each of their multiple clients (Darlene, Allen, Francisco, and Celia), did not disclose the settlement to their multiple clients, and did not obtain the consent of each of their multiple clients to the settlement.

After speaking with Luz only, Watson of R&W called Dean and told him that the clients wanted to accept the KCSR settlement offer. Dean likely assumed that Watson had discussed the $500,000 offer and its allocation with each client member of the Chavez Family, and thus the consultation and consent requirements of Disciplinary Rule

---

[24] The Court has already determined that Luz did not consent (and did not have the authority to consent) to the KCSR settlement offer of $500,000 on behalf of the other four adult members of the Chavez Family. As a factual matter, the Court has also found that Luz (the only family member that R&W spoke with) did not fully understand the $500,000 settlement offer and the complex allocation devised by Rosenthal.

1.08(f) were satisfied. Dean was incorrect in this assumption, as Watson and R&W never discussed the $500,000 offer and allocation with the other four adult client members of the Chavez Family. Dean then took the allocation devised by Rosenthal, adjusted the allocation in later discussions with Watson, and sent the Dean Letter to counsel for KCSR. (Ex. P-1). The Dean Letter broke down the lump-sum offer made by KCSR to individual claimants and R&W expenses; however, this allocation was never discussed in any manner with the other four adult clients. The Dean Letter also included an additional $25,000 allocation to R&W for expenses (raising the expense reimbursement to $325,000), which was never discussed with Luz or the other four adult clients.

A Texas court has found a settlement to be unenforceable as against public policy when the settlement violated the Disciplinary Rule prohibiting aggregate settlements. [25] *Quintero v. Jim Walter Homes, Inc.*, 709 S.W.2d 225, 229-30 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).

In *Quintero*, a plaintiffs' attorney filed suit for one homeowner couple (the Quinteros) against a homebuilder, and with client consent, engaged a trial attorney that tried the suit. At the same time, the plaintiffs' attorney also represented multiple other homeowner clients in claims against the homebuilder. The plaintiffs' attorney negotiated a lump-sum aggregate settlement of $1.8 million for his other multiple clients with the homebuilder's counsel, to be divided among all the homeowner clients according to a formula. The plaintiffs' attorney then consulted with his homeowner clients that had filed suit (the Quinteros) and obtained their consent to join in the aggregate settlement with his

---

[25] *Quintero* was decided when Disciplinary Rule 5-106(a) of the Code of Professional Responsibility was in effect, which is substantially the same as present Rule 1.08(f).

other multiple clients and release their claims against the homebuilder. Unknown to the plaintiffs' attorney or the homeowner Quinteros at the time, the trial court had rendered a judgment in the suit in favor of the homeowner Quinteros against the homebuilder that was litigated by the associated trial attorney. Once the homeowner Quinteros became aware of the more lucrative judgment in their favor, they revoked their consent to the aggregate settlement. The trial court still enforced the settlement against the homeowner Quinteros and dismissed their suit against the homebuilder. *Quintero*, 709 S.W.2d at 227-28.

The appellate court in *Quintero* reversed the trial court and held that the settlement was unenforceable and void as being against public policy, because it was an aggregate settlement that did not comply with the Disciplinary Rules. *Quintero*, 709 S.W.2d at 230. The appellate court found that the homeowner Quinteros were not informed of the nature of the claims involved in the aggregate settlement or the total settlement amount by their attorney, as required by the Disciplinary Rule governing aggregate settlements. The appellate court also found that the settling homeowner clients (the Quinteros) were not provided with a list of the individual amounts that other settling clients would receive by their attorney, another requirement of the Disciplinary Rule governing aggregate settlements. The *Quintero* court stated that the purpose of the Disciplinary Rule governing aggregate settlements is to ensure that clients do not give up their rights unless they have full knowledge of the other settlements involved. As a result, the *Quintero* court concluded that the settlement agreement and release was unenforceable as against public policy. *Quintero*, 709 S.W.2d at 229-30.

The Court is aware that the *Quintero* case involved one relatively extreme fact (the

68

settling homeowners were unaware of a more lucrative judgment in their favor) when they agreed to the aggregate settlement. Nonetheless, in finding the settlement unenforceable, the *Quintero* court focused on the Disciplinary Rule governing aggregate settlements, and its requirement that clients be fully informed about what other clients are receiving through an aggregate settlement.

Here, with respect to the KCSR settlement sought to be enforced against the Chavez Family, the facts are more extreme than those presented in *Quintero*. Four adult clients of the Chavez Family were never even informed of the aggregate settlement by their attorney, and never consented to settlement of their individual claims. In contrast, the clients in *Quintero* were informed of the aggregate settlement (albeit inadequately) by their attorney and affirmatively consented to the aggregate settlement. No member of the Chavez Family (including the uninformed four adult clients) ever signed a release of their claims against KCSR based on the settlement. In contrast, the clients in *Quintero* signed a release of their claims based on the aggregate settlement. The only adult member of the Chavez Family that was informed of the aggregate settlement by R&W was Luz—in a relatively short phone call—and she did not fully understand the settlement. In contrast, the clients in *Quintero* were called by their attorney to discuss the settlement and then, at the attorney's request, went to their attorney's office to discuss the settlement before agreeing to the settlement.

Here, the aggregate settlement offer made by KCSR was allocated among the Chavez Family clients by Rosenthal (now a convicted felon for offenses committed in the same time frame), without consulting with any client. The allocation devised by Rosenthal resulted in his law firm (R&W) getting about 60% of the total settlement amount, and the

clients netting less than 30% of the settlement. Unilateral changes were then made to Rosenthal's allocation to increase the recovery to the R&W firm by $25,000, without discussion with or the consent of any client. This revised allocation found its way into the Dean Letter sent to KCSR, representing the 2010 settlement.

The Court does not lightly determine that the 2010 settlement with KCSR is unenforceable because it is an impermissible aggregate settlement. The Court recognizes that KCSR bears little or no responsibility for the failure of R&W and Dean to consult with each of their clients about the aggregate settlement and to obtain each of their clients' informed consent to the aggregate settlement. But KCSR could have avoided the aggregate settlement requirements if KCSR had conducted individual negotiations with Dean or R&W about each of the claims of the different Chavez Family members. That did not occur, and the facts in this case are extreme and unusual. The safeguards created for clients like the Chavez Family by Disciplinary Rule 1.08(f) were not even close to being satisfied in this case.

For these reasons, the Court concludes that the 2010 settlement with KCSR is unenforceable because it is an impermissible aggregate settlement.

(4) Specific Performance of Settlement

KCSR and the Trustee seek specific performance and enforcement of the 2010 settlement against the Chavez Family, based on a breach of contract theory. The Court concludes that KCSR and the Trustee are not entitled to specific performance of the 2010 settlement against the entire Chavez Family. The Court also declines to order partial specific performance of the 2010 settlement against Luz (the only family member that agreed in any manner to the 2010 settlement).

Specific performance of a contract is an equitable remedy under Texas law that may be awarded at the trial court's discretion upon a showing of breach of contract. *TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*, 570 S.W.3d 749, 768 (Tex. App.—Tyler 2018, pet. denied) (supporting citations omitted); *see also Roundville Partners L.L.C. v. Jones,* 118 S.W.3d 73, 79 (Tex. App.—Austin 2003, pet. denied) (recognizing that specific performance is not a matter of right to enforce a contract, instead it is a "matter of grace" in the discretion of the trial court).

The Court has already determined that the 2010 KCSR settlement reflected by the Dean Letter is not enforceable against Darlene, Allen, Francisco, and Celia (the other adult client members of the Chavez Family) for the multiple reasons set forth above.  In sum, these other adults did not authorize or approve the settlement of their individual claims.  Dean was not an authorized attorney of record and had no authority to settle the claims of the Chavez Family under Rule 11 through the Dean Letter as their attorney of record.  These four adults were never consulted about or consented to the aggregate settlement of their claims.  As a result, these four adults did not breach any contract with KCSR, and specific performance of the settlement against these four adults is simply not an available remedy.

The Court has found that Luz (one member of the Chavez Family) agreed to the 2010 settlement on her own behalf, in a phone call with Watson of R&W on September 28, 2010.  After the close of evidence and prior to closing arguments, the Court asked KCSR if, in the event the Court determined that Darlene and Allen were not bound by the settlement, it wanted the Court to consider a decree of partial specific performance of the 2010 settlement against Luz.  KCSR responded in the affirmative (dkt# 132).

The Court concludes that an award of partial specific performance of the 2010 settlement against Luz would not be proper. In this Opinion, the Court has now determined that the 2010 settlement is not enforceable against Luz for several reasons. In sum, Dean was not an authorized attorney of record for Luz and had no authority to settle the claims of Luz under Rule 11 through the Dean Letter as her attorney of record. The 2010 settlement is also unenforceable as an aggregate settlement. These determinations mean that Luz did not breach any enforceable contract with KCSR, and partial specific performance of the 2010 settlement against Luz is not even an available remedy.

Even if partial specific performance of the settlement were an available remedy, the Court would, in its discretion, equitably decline to order partial specific performance against Luz under the circumstances. As set forth in its detailed factual findings, Luz did not fully understand the KCSR settlement offer and the complex allocation devised by Rosenthal explained to her in one phone call from Watson. In short, Luz did not give an effective and informed consent to the settlement. Numerous important details about the settlement were never even discussed with Luz, such as increasing the expense allocation to R&W, confidentiality with liquidated damages, and indemnity. The Court agrees with KCSR that the 2010 settlement seems quite fair and reasonable to the Chavez Family under the circumstances. But the simple fact is that all members of the Chavez Family did not accept the settlement; and the Court cannot make the Chavez Family agree to it.

For these reasons, the Court declines to enforce the 2010 settlement by complete or partial specific performance.

(5) Conclusion: The Settlement is Not Enforceable

In conclusion, for a host of independent reasons, the Court determines that KCSR and the Trustee are not entitled to enforce the 2010 settlement against the Chavez Family by specific performance for breach of contract.

As a result, all relief sought by KCSR against the Chavez Family in the KCSR Complaint (dkt# 1) will be denied by the Court.  The relief sought by the Trustee for breach of contract against the Chavez Family in the Trustee Counterclaims (dkt# 56) will also be denied by the Court.  The Court finds it unnecessary to reach the other defenses raised by the Chavez Family to enforcement of the 2010 settlement, particularly given the already substantial girth of this Opinion.

## B. **Breach of Fiduciary Duty**

The Chavez Family contends that R&W breached its fiduciary duty to them as clients, in their crossclaim filed against the R&W estate.  *See* Chavez Crossclaims (dkt# 50-1, ¶¶ 58-65).

In substance, the Chavez Family alleges that R&W breached their fiduciary duties by: (1) R&W making false representations that the Chavez Family had authorized R&W and Dean to settle their claims against KCSR in the wrongful death suit; (2) R&W entering into an aggregate settlement without consent of all members of the Chavez Family; (3) R&W hiring Dean to act as trial counsel and entering into a fee sharing agreement with Dean without consent of the Chavez Family; (4) R&W producing portions of client files which contained privileged information of the Chavez Family in February 2014; (5) R&W entering into a conspiracy with KCSR to cause dismissal of their wrongful death claims; and (6) R&W not providing proof of payment of each expense item incurred by R&W.  *See*

Chavez Crossclaims (dkt# 50-1, ¶¶ 58-65).  The Chavez Family seeks equitable fee forfeiture by R&W and to void the fee agreements (the Engagement Contract) with R&W due to such breaches of fiduciary duty.  *See* Chavez Crossclaims (dkt# 50-1, ¶ 62); PTO (dkt# 98, ¶ 133).

In sum, the Court concludes that R&W committed clear and serious breaches of their fiduciary duty to the Chavez Family in certain respects, as set forth below.  The Court also concludes that equitable forfeiture of all fees owed to R&W under the Engagement Contracts and a portion of R&W's expenses is the proper equitable remedy for such breaches under the circumstances, as explained below.

(1) <u>Legal Standards: Breach of Fiduciary Duty</u>

An attorney owes fiduciary duties to a client as a matter of law.  *Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 428-29 (Tex. App.—Austin 2009, no pet.) (citing *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)).  In this context, the term "fiduciary" refers to "integrity and fidelity," and accordingly, the "attorney-client relationship is one of most abundant good faith, requiring absolute perfect candor, openness and honesty, and the absence of any concealment or deception."  *Beck*, 284 S.W.3d at 429 (quoting *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (internal quotations omitted)).  Attorneys must, among other things, "render a full and fair disclosure of facts material to the client's representation."  *Beck*, 284 S.W.3d at 429 (citing *Willis*, 760 S.W.2d at 645).

To prevail on a breach of fiduciary duty claim against an attorney, the following must be established: (1) the existence of a fiduciary duty relationship, (2) a breach of that duty by the attorney, (3) which causes (4) damages to the client.  *Beck,* 284 S.W. 3d at

429 (supporting citation omitted). However, causation and damages need not be proven for a client to obtain the equitable remedy of fee forfeiture based on a "clear and serious" breach of fiduciary duty. *See Burrow v. Arce*, 997 S.W.2d 229, 240-41 (Tex. 1999); *Beck*, 284 S.W.3d at 429.

Texas law recognizes a difference between a breach of fiduciary duty claim and a negligence claim against an attorney. If the gist of a client's complaint is that an attorney did not exercise the same degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess, the claim should be pursued as a negligence claim; if a client's complaint is more appropriately classified as a breach of fiduciary duty, then a client can assert a claim other than negligence. The remedy sought by the client also informs the proper classification of the claim. *See Beck,* 284 S.W.3d at 429 (supporting citations omitted). Generally, a breach of fiduciary duty claim focuses on whether an attorney received an improper benefit from representing a client, while a negligence claim focuses on whether the attorney represented the client with the requisite skill. *Beck*, 284 S.W.3d at 429 (internal citations omitted). Breach of fiduciary duty by an attorney most often involves conflicts of interest, failure to deliver funds, placing an attorney's interests over a client's interest, improper use of client confidences, taking advantage of a client's trust, engaging in self-dealing, and making misrepresentations. *Beck,* 284 S.W.3d at 429 (internal citations omitted).

(2) R&W Breaches of Fiduciary Duty

The Court concludes that R&W had and breached their fiduciary duty to the Chavez Family in the following respects.

First, R&W misrepresented that all members of the Chavez Family had authorized

R&W and Dean to settle their claims against KCSR in the wrongful death suit, as set forth in detail in the Court's findings of fact and other conclusions of law. In sum, R&W did not have the consent of all five client members of the Chavez Family to settlement of the suit. R&W only obtained the verbal consent of one client (Luz), which was not an effective informed consent. The other four adult members were not even informed about the proposed settlement by R&W and did not consent to the settlement in any manner. Disciplinary Rule 1.02(a)(2) required that R&W communicate and obtain the consent of their clients to accept any settlement offer. *See* DISCIPLINARY RULE R. 1.02(a)(2). [26] R&W made these misrepresentations for its own personal benefit—to be able to recover the lion's share of the proposed settlement ($325,000) at a time when R&W was struggling financially. R&W placed its own interests ahead of the interests of its clients (the Chavez Family). This is a clear and serious breach of fiduciary duty by R&W.

Second, R&W entered into and promoted an impermissible aggregate settlement of the claims of all members of the Chavez Family against KCSR, as set forth in detail in the Court's findings of fact and other conclusions of law. In sum, R&W represented multiple clients in the wrongful death suit, KCSR made a lump-sum offer to settle all claims of their clients, Rosenthal of R&W internally devised an allocation scheme, and Watson (on behalf of R&W) communicated and consulted with only one client (Luz) about the $500,000 offer and the allocation between the different clients. R&W did not consult with each of their multiple other clients, did not disclose the aggregate settlement to their multiple other clients, and did not obtain the consent of each of their multiple clients to the

---

[26] *See also Bellino v. Comm'n for Lawyer Discipline,* 124 S.W.3d 380, 387 (Tex. App.—Dallas 2003, pet. denied) (holding that evidence was sufficient to support finding that attorney violated Rule 1.02(a)(2) where attorney failed to obtain client's consent before accepting settlement offer).

aggregate settlement.

Under Texas law, when an attorney enters into an aggregate settlement without the consent of clients, the attorney breaches a fiduciary duty owed to the clients. *See, e.g., Arce v. Burrow*, 958 S.W.2d 239, 245 (Tex. App.—Houston [14th Dist.] 1997), *rev'd in part on other grounds*, *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999); *accord Authorlee*, 274 S.W.3d at 126; *Estate of Aguilar*, No. 04-15-00688-CV, 2017 WL 1244447, at *8 (Tex. App.—San Antonio Apr. 5, 2007, pet. denied) (mem. op.). Settling a case in mass without consent of the clients is unfair to the clients as such settlement "may result in a benefit to the attorney (speedy resolution and payment of fees) to the detriment of the clients (decreased recovery)." *Arce,* 958 S.W.2d at 245. Because "[u]nfairness is the cornerstone in an action for breach of fiduciary duty," when an attorney enters into an aggregate settlement without the consent of clients, the attorney breaches the fiduciary duty owed to those clients. *Arce,* 958 S.W.2d at 245. This impermissible aggregate settlement is also a clear and serious breach of fiduciary duty by R&W.

Third, R&W hired Dean to be lead trial counsel for the Chavez Family and also entered into a fee sharing agreement with Dean without the knowledge or consent of its clients (the Chavez Family), as set forth in detail in the Court's findings of fact and other conclusions of law. R&W then concealed from the Chavez Family that Dean was negotiating a settlement on their behalf and that R&W had instructed Dean to send the Dean Letter to KCSR in October 2010 settling all their claims. The unilateral hiring of Dean by R&W was material to the representation of the Chavez Family and was not disclosed to the Chavez Family until the jury trial had started.

By unilaterally hiring Dean to represent the Chavez Family and having Dean send

the Dean Letter settling the suit without the clients' prior knowledge and consent, R&W not only ignored Disciplinary Rules 1.02(a)(2) and 1.04(g), but also failed to "render a full and fair disclosure of facts material" to their clients (the Chavez Family). *See Beck,* 284 S.W.3d at 429. The failure of R&W to obtain the consent of the Chavez Family to the hiring of Dean and the sending of the Dean Letter demonstrates the lack of "candor, openness and honesty" as well as "concealment" employed by R&W in its dealings with the Chavez Family. *See Goffney,* 56 S.W.3d at 193. The Chavez Family trusted R&W to represent them in the wrongful death suit, and R&W improperly took advantage of that trust by hiring another attorney (Dean) to try the suit and then settle the suit without the knowledge or consent of the Chavez Family. This is also a clear and serious breach of fiduciary duty by R&W.

The Court concludes that R&W did not breach any fiduciary duty to the Chavez Family in the following respects.

The Chavez Family contends that R&W's production of a portion of the Chavez Family case file that contained privileged information constitutes a breach of fiduciary duty by R&W. The Court concludes that this production was not a breach of fiduciary duty by R&W under the circumstances. Rule 503(b) of the Texas Rules of Evidence sets forth the general rule that a client holds the attorney-client privilege to prevent disclosure of confidential communications between an attorney and client. TEX. R. EVID. 503(b). However, there is an exception to the general rule set forth in Rule 503(d)(3). If the privileged communication is relevant to an issue of breach of duty to or by a client, the privilege does not apply. TEX. R. EVID. 503(d)(3). Here, the redacted client files produced by R&W (Ex. P-4) directly relate to issues about whether R&W had the consent of their

clients to settle the wrongful death suit and to enter into an aggregate settlement, which the Chavez Family contends are breaches of fiduciary duty by R&W.

Just as importantly, because the Chavez Family asserted to the State Court that R&W did not have their consent to settle the wrongful death suit, the Chavez Family waived any attorney-client privilege with respect to communications between R&W and the Chavez Family about their consent to the settlement.  According to the Fifth Circuit and the great weight of authority, the attorney-client privilege is waived by a client when a client places information protected by the privilege at issue through some affirmative act for the client's own benefit.  *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989).  To allow the privilege to protect against disclosure of such information under such circumstances would be manifestly unfair to the attorney.  *Conkling*, 883 F.2d at 434.  Here, the case file notes produced by R&W (Ex. P-4) were relevant to the lack of consent issues raised by the Chavez Family and were carefully redacted by R&W prior to production to include only information relevant to consent.

The Chavez Family has also alleged that R&W breached its fiduciary duty by conspiring with KCSR to cause dismissal of their wrongful death suit.  The probative evidence at trial did not prove that there was any conspiracy between KCSR and R&W.  Further, the Court has previously dismissed the separate conspiracy claims asserted by the Chavez Family against R&W and KCSR under Rule 12(b)(6).  *See* Orders (dkt# 69, 70).

Finally, the Chavez Family has alleged that R&W breached its fiduciary duty because R&W and the Trustee did not produce proof of payment of each expense item sought by R&W.  As a factual matter, the Chavez Family stipulated at trial that R&W had

incurred out-of-pocket expenses on behalf of the Chavez Family in the prosecution of the wrongful death suit against KCSR totaling $417,622.  *See* PTO (dkt# 98, ¶ 87).  The witnesses at trial (including current counsel for the Chavez Family) testified that such expenses were incurred by R&W and were reasonable.  And as a legal matter, this would not constitute a breach of fiduciary duty by R&W in any event.

(3) Equitable Forfeiture of Fees and Expenses

The Texas Supreme Court has held that when an attorney breaches a fiduciary duty to a client, the attorney may be required to forfeit all or part of the attorney's fees, regardless of whether the breach caused actual damages to the client.  Specifically, forfeiture may be appropriate where a "clear and serious" violation of an attorney's duty to a client has occurred.  *Burrow,* 997 S.W.2d at 243.

To determine whether the attorney has committed a "clear and serious" violation of fiduciary duty, as well as the extent to which forfeiture is appropriate, a court should apply the following non-exclusive factors to the individual circumstances of the case: the gravity and timing of the violation,  its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies to the client.  *Burrow*, 997 S.W.2d at 243, 245.  The Texas Supreme Court in *Burrow* stated that the "public interest in maintaining the integrity of attorney-client relationships" is an additional factor that "must be given great weight" in deciding forfeiture.  *Burrow*, 997 S.W.2d at 244.

Forfeiture of compensation for breach of fiduciary duty is an equitable remedy under Texas law, with the ultimate decision on the amount of forfeiture to be determined by the court in its discretion.  *Burrow,* 997 S.W.2d at 245.

Here, after considering the factors outlined by the Texas Supreme Court in *Burrow,* the Court concludes that the breaches of fiduciary duty by R&W are "clear and serious" and a total forfeiture of all fees and a portion of expenses by R&W under the Engagement Contracts is appropriate based on the circumstances in this case.

The gravity, timing, and willfulness of the violations by R&W are quite serious.  In short, R&W had five adult clients, obtained the verbal consent of one client to the proposed KCSR settlement on the phone (and even that was not an effective informed consent), and subsequently represented the settlement as being authorized by all five clients.  The Engagement Contract signed by each client with R&W clearly stated that R&W would not settle the claim of each client without "MY" (each client's) consent, and R&W willfully ignored this clear written directive.  The KCSR settlement offer also had conditions (such as confidentiality, indemnity, and liquidated damages) which were never discussed or disclosed by R&W to any of its clients.

Compounding the gravity and willfulness of the violations was that the settlement here was an aggregate settlement.  The allocation of the lump-sum settlement offer from KCSR was made internally by Rosenthal of R&W without consulting with any client, and his internal allocation gave the lion's share of the settlement to R&W.  When the amount of the settlement offer was increased by KCSR, the initial allocation was then adjusted by R&W to allocate even more to R&W, without informing any client.  R&W completely failed to discuss and obtain any consent to the aggregate settlement from four of their five adult clients.  R&W also clearly placed its own financial interests in the settlement ahead of the interests of its clients, and plainly violated the Disciplinary Rule governing aggregate settlements.

Just before the jury trial, R&W saw fit to unilaterally hire another attorney (Dean) to appear as its attorney of record and to try the wrongful death suit as lead trial counsel, without disclosing or obtaining consent of the clients.  R&W also entered into a fee sharing arrangement with Dean without the consent of its clients—a clear violation of the Disciplinary Rules.  The hiring of Dean by R&W and his appearance in the suit as attorney of record was not known to or authorized by the clients.  This unauthorized appearance of Dean as an attorney of record in the suit (caused by R&W) led to a cavalcade of misfortune for the Chavez Family, including a defense verdict, a settlement letter by an unauthorized attorney of record (the Dean Letter) in October 2010, and years of appeals by the clients to try and undo the unauthorized settlement.

No real value was received by the Chavez Family (the clients) from the services rendered by R&W.  No value was received from the jury trial in State Court, which resulted in a unanimous defense verdict. Although a new trial was granted, the new trial has been delayed for nearly a decade while the legal battle (caused by R&W's actions) has raged over the enforceability of the 2010 KCSR settlement.  In effect, the Chavez Family will now be starting close to ground zero with respect to the new and second trial of its wrongful death suit against KCSR.

The Chavez Family has suffered harm due to the violations by R&W, primarily in the form of attorney's fees incurred in fighting the 2010 KCSR settlement up and down the appellate and trial court levels, as well as the passage of time.  Yet no adequate legal remedy for damages against R&W exists now for the Chavez Family.  R&W is now insolvent and out of business. R&W has since filed Chapter 7 liquidation bankruptcy, and the R&W estate cannot pay any damage award or attorney's fees incurred due to the

misdeeds of R&W.  Here, equitable forfeiture is the only real and available remedy for the Chavez Family.

The interest of the public in maintaining the integrity of the attorney-client relationship requires a complete forfeiture of fees by R&W and a partial forfeiture of expenses by R&W, given the unseemly circumstances of this case.  Clients should be able to rely on their law firm not to settle a case without their consent.  Clients should be able to know that their law firm will not put their financial interests ahead of clients.  Clients should be able to rely on the law firm they employed to pursue and try a suit, without fear that the law firm will unilaterally delegate that responsibility to a different attorney that the clients have never even met or approved.  Clients should be able to know that their law firm will follow the Disciplinary Rules and engagement contracts that they sign with the law firm.

In *Burrow*, the Texas Supreme Court specifically addressed equitable forfeiture of fees by an attorney for breach of fiduciary duty.  997 S.W.2d at 232.  Forfeiture of expenses was not raised on appeal by the parties and therefore was not addressed in *Burrow*.  Exhaustive research did not reveal any Texas cases which prohibited a court from ordering equitable forfeiture of expenses for breach of fiduciary duty.  One Texas federal district court has held that equitable forfeiture of expenses, as well as fees, is appropriate for breach of fiduciary duty using the rationale of the *Burrow* decision.  *See Ginn v. Seidel (In re Allied Physicians Grp.)*, No. Civ.A.3:04-CV-0765-G, 2004 WL 2965001, at *3 (N.D. Tex. Dec. 15, 2004).  The *Ginn* court found that expenses were a form of compensation and that under the remedial regime of *Burrow*, the court had

discretion to require forfeiture of compensation, which includes reimbursable expenses. 2004 WL 2965001, at *3.

Indeed, while examining the jurisprudential underpinnings governing the equitable remedy of forfeiture for breach of fiduciary duty, the Texas Supreme Court in *Burrow* stated:

> In principle, a person who agrees to perform compensable services in a relationship of trust and violates that relationship breaches the agreement, express or implied, on which the right to compensation is based. The person is not entitled to be paid when he has not provided the loyalty bargained for and promised.

*Burrow*, 997 S.W. 2d at 237-38.

Here, for the multiple reasons already set forth, R&W breached the relationship of trust with the Chavez Family and the Engagement Contracts between the parties. R&W's right to be reimbursed for expenses arises out of the Engagement Contracts which R&W has breached. As a result, the Court concludes that R&W should be required to equitably forfeit a portion of its expenses, as well as its fees, under the Engagement Contracts with the Chavez Family.

R&W incurred expenses on behalf of the Chavez Family in the prosecution of the wrongful death suit against KCSR totaling $417,622. These expenses included advances of about $64,000 to $73,000 by R&W to Luz and Darlene for living expenses. *See* PTO (dkt# 98, ¶¶ 53, 87); Case Expense List (Ex. P-38). The bulk of the expenses incurred by R&W appear to be for experts and deposition costs for the first jury trial. (Ex. P-38).

The amount of the expenses incurred by R&W in prosecuting the wrongful death suit through the first trial were significant. On one hand, the Court recognizes that since R&W is now in bankruptcy, innocent creditors of the R&W estate may suffer from any reduction in expenses owed to R&W. On the other hand, these R&W expenses will be of

limited benefit to the Chavez Family now.  More than a decade has elapsed since the first jury trial in the wrongful death suit.  As a result, new expert reports for the wrongful death suit will undoubtedly have to be sought and obtained at considerable expense, the memories of previously deposed witnesses will have undoubtedly faded and may have to be retaken, and additional expenses will have to be borne to prepare for an upcoming second trial of the wrongful death suit.  Finally, forfeiture of just R&W's fees is not adequate under the circumstances, as they are contingency fees (40%) with the contingency not having occurred (and which may never occur).

After balancing all equitable concerns, the Court concludes that a partial forfeiture of 50% of R&W's expenses is appropriate for the clear and serious breaches of fiduciary duty by R&W under the circumstances of this case.  As consequence, the Court determines that $208,811 of the $417,622 in expenses incurred by R&W should be forfeited, in addition to all of R&W's fees (40% contingency fee) under the Engagement Contracts.

(4) <u>Trustee Defenses to Breach of Fiduciary Duty</u>

The Trustee, on behalf of the R&W estate, has asserted two affirmative defenses to the breach of fiduciary duty claims by the Chavez Family—statute of limitations and the failure of the Chavez Family to timely file a Proof of Claim in the R&W bankruptcy case.

The statute of limitations for breach of fiduciary duty in Texas is four years from the day the cause of action accrues.  TEX. CIV. PRAC. & REM. CODE § 16.004(a)(5).  Here, the actions of R&W that give rise to the breach of fiduciary duty claims based on an unauthorized and impermissible aggregate settlement occurred in September 2010 and October 2010.  The actions of R&W that give rise to the breach of fiduciary duty claims

based on the unauthorized hiring of Dean started in November 2009 and continued through October 2010 (the date of the Dean Letter).  In February 2014, R&W filed this bankruptcy case, which created an automatic stay of actions against R&W and tolled the statute of limitations for claims against R&W.[27]  Because the four-year statute of limitations had not expired when R&W filed its bankruptcy case, the statute of limitations does not bar the breach of fiduciary duty claims by the Chavez Family.

The Trustee also contends that since the Chavez Family did not timely file a Proof of Claim in the R&W bankruptcy case, their claims for breach of fiduciary duty by R&W must be denied.  The Court disagrees for several reasons.  First, the Trustee did not establish that the Chavez Family had notice of the bar date for filing Proofs of Claim in the R&W bankruptcy case, such that a Proof of Claim could be timely filed.  Second, a debtor that is an entity (like R&W) does not receive a discharge of claims in a Chapter 7 case; only a debtor that is an individual gets a discharge of claims in a Chapter 7 case.  *See* 11 U.S.C. § 727(a)(1).  Third, creditors can file Proofs of Claim late (after the claims bar date) in a Chapter 7 case.  *See* 11 U.S.C. § 726(a)(3).  Fourth, it is questionable whether the equitable remedy of forfeiture even constitutes a "claim" in a Chapter 7 bankruptcy case that would require the filing of a Proof of Claim.  *See* 11 U.S.C. § 101(5).

To the extent that the Trustee has asserted any other defenses to the breach of fiduciary duty claims against R&W, the Court finds that they lack merit and should be denied.

---

[27] Statutes of limitation are tolled upon the filing of a bankruptcy case and through such time that the automatic stay is in effect.  *See, e.g.*, *HSBC Bank USA, N.A. v. Crum*, 907 F.3d 199, 206 (5th Cir. 2018); *Peterson v. Tex. Commerce Bank-Austin, Nat'l Ass'n*, 844 S.W.2d 291, 294 (Tex. App.—Austin 1992, no writ).

(5) Conclusion: Breach of Fiduciary Duty

In conclusion, for these reasons, the Court determines that the relief sought for breach of fiduciary duty by R&W in the Chavez Crossclaims (dkt# 50-1) should be granted in part as set forth above.  The Court also determines that all of R&W's fees (40% contingency fee) and 50% of R&W's expenses (the amount of $208,811) under the Engagement Contracts with the Chavez Family should be equitably forfeited for clear and serious breaches of fiduciary duty by R&W.

### C. **Barratry**

The Chavez Family alleges that R&W committed barratry by soliciting them as clients back in February 2007, in their crossclaim against the R&W estate.  As a result, the Chavez Family contends that their legal services contracts with R&W (the Engagement Contracts) are voidable.  *See* Chavez Crossclaims (dkt# 50-1, ¶¶ 68-71).

In sum, the Court concludes the barratry claims by the Chavez Family must be denied for multiple reasons set forth below.  First, the barratry theory actually pled by the Chavez Family was not proven by a preponderance of the credible and probative evidence.  Second, the unpled barratry theories raised at trial were not proven by credible evidence and should not be considered by the Court in any event because they were not pled.  Third, as a matter of law, the Chavez Family is not entitled to the relief they seek (voiding the Engagement Contracts) based on the statute and rule relied upon and pled by the Chavez Family in their barratry claim.  Fourth, the statute of limitations has expired on any barratry claim by the Chavez Family.

(1) Pled Barratry Theory Not Proven

The factual basis pled for barratry by the Chavez Family is that R&W allegedly

used a "non-attorney affiliated with the firm to make repeated telephone calls to members of the Chavez family in an effort to convince them to terminate their existing legal counsel" and hire R&W.  The Chavez Family also alleges that "[t]his non-lawyer also visited members of the family at different settings in person, to secure their termination of their existing counsel and subsequent signing" with R&W.  *See* Chavez Crossclaims (dkt# 50-1, ¶¶ 69-70).

These factual allegations by the Chavez Family were not proven at trial by a preponderance of credible evidence.  Instead, the Court was given disjointed, general, and speculative testimony based on second-hand information about what might possibly have happened over 12 years ago.

The Court was able to glean from the testimony that the "non-attorney" was a Mr. George Gavito ("Gavito").  Gavito's relationship with R&W back in February 2007 (the time of the alleged barratry) was never made clear.

The primary barratry theory was that Gavito initiated contact with a relative of the Chavez Family (a "Roel" and possibly a "Leo") and solicited the relative to tell the Chavez Family to meet and hire R&W.  However, this theory was not proven by probative and credible evidence at trial.  For example, Luz testified that she "heard from a family member" that Gavito called "Roel," she did not know if Gavito called "Leo," and that Gavito "probably" visited some family members "down in Brownsville" but she could not specifically remember this happening.  (TR, dkt# 130, pp. 191-194).  Darlene generally testified that Gavito "showed up to my uncle's place of work" and asked if "my uncle could reach out to us."  (TR, dkt# 130, p. 75).  Allen testified that he "had heard that a gentleman showed up to my uncle's work" and that "if I'm [Allen] not mistaken he talked to my—or

tried to talk to my" uncle "Roel" and that Gavito "called Leo because Leo lived in Corpus," but "other than that I don't know."  Finally, on cross-examination, Allen testified that he "was not too sure" whether Leo was contacted by Gavito.  (TR, dkt# 130, pp. 214, 225).  Significantly, none of the persons who participated in and would have actual knowledge of the alleged events (Gavito, Roel, and Leo) were witnesses or provided any testimony at trial.

The second part of the barratry theory—that the Chavez Family had already hired counsel to represent them, and that Gavito and R&W convinced the Chavez Family to terminate their existing counsel and hire R&W—was actually disproven at trial.  Luz and Allen both testified that they had not already hired another attorney before they hired R&W as their counsel.  (TR, dkt# 130, pp. 184, 226).  Watson of R&W confirmed that she did not believe the Chavez Family was represented by a different attorney when they hired R&W.  (TR, dkt# 131, p. 9).

After weighing all the evidence, the Court concludes that the Chavez Family did not prove the barratry theory pled in their crossclaim against R&W—that a non-attorney affiliated with R&W solicited a relative of the Chavez Family to hire R&W and convinced the Chavez Family to terminate counsel already hired by the Chavez Family.

(2) Barratry Theories Not Pled or Proven

During trial, counsel for the Chavez Family raised two new barratry theories that were not pled.  Chavez Crossclaims (dkt# 50-1, ¶¶ 68-71).

Basically, the first unpled theory was that Gavito was paid $10,000 by R&W to secure the Chavez Family as clients for R&W.  The sole evidence of this was brief deposition testimony by Rosenthal taken at a federal prison.  In his deposition, Rosenthal

testified: "I know Jim Solis paid [Gavito].  If I'm not mistaken, I'm guessing it was $10,000 maybe, something like that." (Ex. JT-1, Rosenthal deposition, p. 79).  It was not proven at trial that Jim Solis was an attorney with R&W; instead, Jim Solis was an attorney with his own firm.  Further, the uncertain testimony of convicted felon Rosenthal ("If I'm not mistaken," "guessing," "maybe," and "something like that") is not credible evidence to the Court.  Finally, Watson of R&W contradicted Rosenthal's testimony and testified that Gavito was not paid $10,000 to sign up the Chavez Family.  (TR, dkt# 131, pp. 119-120). Again, none of the participants in this alleged event (Gavito or Solis) were witnesses or provided any testimony at trial.

After weighing all the evidence, the Court concludes that the Chavez Family did not prove their first unpled barratry theory—that Gavito was paid $10,000 by R&W to secure the Chavez Family as clients of R&W.  Further, since this new barratry theory involving the alleged payment of $10,000 to Gavito was not pled by the Chavez Family in their crossclaim against R&W, this new barratry theory should be denied by the Court in any event.  *See* Chavez Crossclaims (dkt# 50-1, ¶¶ 68-71).

The second unpled barratry theory raised at trial was that R&W offered and paid Luz $10,000 up front so that Luz would employ R&W as her counsel.  This unpled theory was not proven by credible evidence at trial.  Luz provided rambling and largely incoherent testimony regarding the $10,000 payment. (TR, dkt# 130, pp. 175, 178-82).  After weighing the evidence and the credibility of the witnesses, the Court finds that relatives of Luz asked R&W to help Luz (who was recently widowed and raising a small child) with living expenses.  In response, R&W agreed to advance $2,000 monthly to Luz plus

$10,000 for living expenses. [28]  In short, the $10,000 was not advanced by R&W to Luz for the purpose of soliciting employment of R&W by the Chavez Family, but instead was advanced at the request of her relatives.  Finally, since this new barratry theory involving payment of $10,000 to Luz was not pled by the Chavez Family in their crossclaim against R&W, this new barratry theory should be denied by the Court in any event.  *See* Chavez Crossclaims (dkt# 50-1, ¶¶ 68-71).

(3) <u>Barratry Claims Pled Denied as Matter of Law</u>

The relevant Texas statute creating a civil barratry claim is section 82.0651 of the Texas Government Code ("<u>Government Code</u>"), which provides as follows:

> A client may bring an action to void a contract for legal services that was procured as a result of conduct violating *Section 38.12(a) or (b), Penal Code, or Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct* of the State Bar of Texas, regarding barratry by attorneys or other persons . . .

TEX. GOV'T CODE § 82.0651(a) (emphasis added).

Sections 38.12**(a)** and 38.12**(b)** of the Texas Penal Code ("<u>Penal Code</u>") contain a lengthy laundry list of acts that constitute both criminal and civil barratry.  But the section of the Penal Code relied upon and pled by the Chavez Family in their crossclaim against R&W is section 38.12**(d)** of the Penal Code.  *See* Chavez Crossclaims (dkt# 50-1, ¶ 68). Section 38.12(d) of the Penal Code has an additional laundry list of acts that constitute only criminal barratry.  A violation of section 38.12(d) of the Penal Code (the section relied upon and pled by the Chavez Family) does not constitute civil barratry.  Only a violation of section 38.12(a) or section 38.12(b) of the Penal Code constitutes civil barratry that

---

[28] Advancing funds to a client for living expenses does not constitute barratry. *See* DISCIPLINARY RULES R. 1.08(d)(1) and 7.03(c).

entitles a client to void a legal services contract. *See* TEX. GOV'T CODE § 82.0651(a), (c).

As the Trustee for R&W correctly points out, this Court (a bankruptcy court) has no jurisdiction or authority to adjudicate purely criminal barratry offenses under section 38.12**(d)** of the Penal Code, since they do not also give rise to a civil barratry claim. And a violation of section 38.12**(d)** of the Penal Code pled and relied upon by the Chavez Family does not constitute civil barratry that would void a legal services contract under the Government Code, as a matter of law.

Similar problems exist with the allegation of the Chavez Family that the Disciplinary Rule governing barratry entitles them to void the legal services contract with R&W. The Chavez Family pled and relies upon an alleged violation of Disciplinary Rule **8.04(a)(1)** as grounds for voiding the contract with R&W. [29] Chavez Crossclaims (dkt# 50-1, ¶ 68). But the controlling statute—the Government Code—does not provide for voiding a legal services contract based on a violation of Disciplinary Rule 8.04(a)(1). Instead, the Government Code provides that a legal services contract can be voided for a violation of Disciplinary Rule **7.03**. *See* TEX. GOV'T CODE § 82.0651(a). A violation of Disciplinary Rule 8.04(a)(1) cited by the Chavez Family does not constitute civil barratry that would entitle them to void a legal services contract under the Government Code, as a matter of law.

For these reasons, the Court concludes that the Chavez Family is not entitled to void the legal services contract with R&W (the Engagement Contracts) for barratry based

---

[29] Disciplinary Rule 8.04(a)(1) relied upon by the Chavez Family does not even directly address barratry. Instead, this Rule generally prohibits attorneys from violating the Disciplinary Rules or knowingly assisting or inducing others to violate the Disciplinary Rules. *See* DISCIPLINARY RULES R. 8.04(a)(1).

on their crossclaim, as a matter of law. [30]

(4) <u>Statute of Limitations Bars Barratry Claims</u>

The Trustee, on behalf of the R&W estate, also contends that any civil barratry claim by the Chavez Family is barred by statute of limitations.  The Court agrees for the reasons set forth below.

There is no specific statute of limitations for bringing a civil barratry claim in Texas. However, the Texas Civil Practice and Remedies Code provides a residual statute of limitation of four years.  TEX. CIV. PRAC. & REM. CODE § 16.051.

Only one written opinion in Texas was located that addresses the statute of limitations for barratry.  *See Neese v. Lyon*, 479 S.W.3d 368, 383-84 (Tex. App.—Dallas 2015, no pet.).  The *Neese* court found that the four-year residual statute of limitations of section 16.051 of the Texas Civil Practice and Remedies Code applied to a client's cause of action for barratry against their former attorney to void a fee agreement.  479 S.W.3d at 384.

Here, the Chavez Family did not bring a barratry claim against R&W until March 4, 2019.  *See* Chavez Crossclaims (dkt# 50-1, ¶¶ 68-71).  The facts alleged by the Chavez Family giving rise to the barratry claim occurred in February 2007 and were known by the Chavez Family at the time.  Over 12 years elapsed between the date any cause of action for barratry accrued (February 2007), and the filing of a barratry claim by the Chavez Family against R&W (March 2019).  As a result, the four-year statute of limitations has

---

[30] Even if the Court were to consider the uncited and unpled laundry list of civil barratry offenses under section 38.12(a) and section 38.12(b) of the Penal Code and Disciplinary Rule 7.03, the Court has determined that the Chavez Family did not establish civil barratry by a preponderance of credible evidence, as set forth above.

long since expired, and any claim for civil barratry by the Chavez Family against the R&W estate is barred by the statute of limitations. [31]

(5) Conclusion: Barratry Claims Denied

In conclusion, for these many reasons, the Court determines that the claims for civil barratry by the Chavez Family must be denied.  As a result, all relief sought by the Chavez Family against the R&W estate for barratry in the Chavez Crossclaim (dkt# 50-1) will be denied by the Court.

### D. **Trustee's Other Counterclaims**

On behalf of the R&W estate, the Trustee has alleged three other counterclaims against the Chavez Family: (1) a contractual attorney's lien under the Engagement Contracts; (2) quantum meruit; and (3) unjust enrichment.  *See* Trustee Counterclaims (dkt# 56, ¶¶ 43-55). [32]  The Court now addresses each of these three counterclaims in turn.

(1) Attorney's Lien

The Trustee, on behalf of the R&W estate, asserts a contractual attorney's lien created under the Engagement Contracts in the amount of 40% of any recoveries the Chavez Family may obtain from KCSR and for $419,000 in R&W's expenses. [33]  *See*

---

[31]  The Court recognizes that the bankruptcy filing by R&W in February 2014 and attendant automatic stay tolled the statute of limitations for claims against R&W.  *See Crum*, 907 F.3d at 206; *Peterson*, 844 S.W.2d at 294.  But even at that point, seven years had elapsed between the date of accrual of the barratry claim (February 2007) and the date of the bankruptcy filing by R&W (February 2014), which exceeds the four-year statute of limitations.

[32]  The Court has already addressed and denied the Trustee's counterclaim for breach of contract (the 2010 KCSR settlement) against the Chavez Family in its prior conclusions of law.

[33]  The Trustee refers to the Engagement Contracts as an "AOI" (Power of Attorney with Assignment of Interest) in his counterclaim.

Trustee Counterclaims (dkt# 56, ¶¶ 43-46).

In pertinent part, the Engagement Contracts signed by each member of the Chavez Family with R&W provide as follows:

I [each member of the Chavez Family] hereby irrevocably sell, transfer, assign and convey to my Attorneys [R&W] an undivided interest of . . . FORTY PERCENT (40%) of said claims and of all amounts received by settlement, judgment, or otherwise of all amounts should suit be filed . . .

I hereby authorize my Attorneys to incur such expenses on my behalf as Attorneys may deem advisable for the purpose of investigating, preparing, prosecuting and presenting my claims.  The Attorneys' fee interest is calculated on the gross recovery before deduction of expenses of litigation, investigation, and all other expenses and sums of money to be paid or guaranteed *by lien* or otherwise to be paid to said Attorneys out of the amount collected . . .

Client [each member of the Chavez Family] authorizes Attorney in their discretion to incur and pay on Client's behalf expenses of investigation and prosecution of the claim, including, but not limited to, witness and expert fees, medical expenses, litigation expenses, travel expenses, paralegal expenses, administrative expenses, trial preparation expense, and court costs . . .

I hereby assign to said Attorneys an interest in my share of the amount collected . . . in a sum of money equal to all expenses of litigation and investigation plus all other expenses and other sums of money paid . . . out of the amount collected, all of which *shall be a lien* against my share of the amount collected . . .

[I]f, in the Attorneys' opinion, a fair and reasonable settlement offer has been made by a defendant or potentially liable party and I reject the advice of the Attorneys to settle, I understand that at the Attorney's option, I shall be obligated to reimburse the attorneys for costs and expenses incurred to that time, and the Attorneys may withdraw from the case, *retaining a lien* on said cause of action for the Attorneys' fees and expenses referred to herein . . .

Client agrees that this Assignment of Interest shall be binding on Client . . . and any other attorneys or law firms who Client shall employ . . .

This agreement becomes effective on the date that this agreement is signed by Client, with or without execution of notarial.

95

(Ex. CD-5) (emphasis added).

R&W incurred out-of-pocket expenses on behalf of the Chavez Family in the prosecution of the wrongful death suit against KCSR totaling $417,622, as of November 10, 2010. *See* PTO (dkt# 98, ¶ 87). The $417,622 in out-of-pocket expenses of R&W are actual, necessary, and reasonable expenses incurred by R&W in the prosecution of the wrongful death suit against KCSR and are within the scope of reimbursable expenses set forth in the Engagement Contracts. The expenses included the cost of multiple experts, reports, research, investigation, depositions, discovery, travel, and jury trial in the complex wrongful death suit. (Ex. P-38). The witnesses at trial (including current counsel for the Chavez Family) testified that such expenses were incurred by R&W and were reasonable.

The Court has already determined that all of R&W's fees (the 40% contingency fee) and 50% of R&W's expenses (the amount of $208,811) under the Engagement Contracts with the Chavez Family should be equitably forfeited for clear and serious breaches of fiduciary duty by R&W.

So, the remaining issue to be decided by the Court is whether the $208,811 in expenses of R&W (the amount of expenses not equitably forfeited) are secured by a contractual attorney's lien under the Engagement Contracts. The Court concludes that the Trustee, on behalf of the R&W estate, has a valid contractual attorney's lien in the amount of $208,811 for R&W's expenses, for the following reasons.

Under Texas law, an attorney may establish a valid lien for attorney's fees and expenses, by contract with a client. *See, e.g., Mount Spelman & Fingerman, P.C. v. GeoTag, Inc.,* 70 F. Supp. 3d 782, 786 (E.D. Tex. 2014) (applying Texas law) (citing

*United States v. Betancourt,* CRIM. B-03-090-S1, 2005 WL 3348908 at *3 (S.D. Tex. Dec. 8, 2005) (applying Texas law); *Stephenson v. LeBoeuf,* 16 S.W.3d 829, 838 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)); *see also* DISCIPLINARY RULE R. 1.08(h) (recognizing that an attorney may ethically acquire a lien to secure fees or expenses).

Here, the Engagement Contracts signed by the Chavez Family granted a valid contractual lien to R&W to secure payment of R&W's expenses. This contractual lien is set forth in three separate provisions. *See* Engagement Contracts ("guaranteed by lien," "all of which shall be a lien," and "retaining a lien") (Ex. CD-5). The lien is binding on the Chavez Family and any other attorneys that the Chavez Family may employ. *See* Engagement Contracts (this Assignment "shall be binding on Client . . . and any other attorneys or law firms who Client shall employ") (Ex. CD-5).

R&W retained a lien for its expenses on the causes of action by the Chavez Family against KCSR under the Engagement Contracts for the following reasons. R&W believed that the 2010 settlement offer made by KCSR was a reasonable and fair offer, which R&W recommended. [34] A unanimous defense verdict had been rendered in favor of KCSR and against the Chavez Family in the wrongful death suit. Although a new trial had recently been granted, there were legitimate concerns regarding whether a new trial would yield a different result. The KCSR settlement offer would put some funds in the pockets of the Chavez Family, and limit the subrogation liens asserted by Lloyds. However, all members of the Chavez Family did not agree to—and ultimately rejected—the KCSR settlement

---

[34] Although the Court agrees with the assessment that the 2010 KCSR settlement offer was reasonable under the circumstances, the Court is in no way condoning the failure of R&W to obtain the consent of all the members of the Chavez Family to the proposed settlement. Regardless of its reasonableness, the KCSR settlement offer could not be accepted by R&W without consulting with and obtaining the consent of each of its clients.

offer.  R&W was effectively discharged and withdrew as counsel.  As a result, under the terms of the Engagement Contracts, R&W retained a lien for their expenses on the causes of action by the Chavez Family against KCSR.

Also, R&W had an assignment from the Chavez Family of any amounts collected from KCSR to secure payment of R&W's expenses.  The Engagement Contracts assign to R&W an interest in the share of the amounts collected by the Chavez Family "in a sum of money equal to all expenses of litigation and investigation plus all other expenses and other sums of money paid" by R&W "out of the amount collected, all of which shall be a lien . . ."  (Ex. CD-5).

Counsel for the Chavez Family has generally asserted that the Engagement Contracts are unenforceable, because the signatures of the Chavez Family members on the Engagement Contracts are not notarized.  Post-trial, the Court provided the Chavez Family with the opportunity to brief this issue, and to specifically set forth exactly what provisions of the Engagement Contracts were unenforceable due to lack of a notarized signature.  *See* Order (dkt# 137).

In response, counsel for the Chavez Family filed a post-trial brief ("Brief") (dkt# 139).  The Brief is difficult to decipher.  The Brief concludes by suggesting that the Engagement Contracts "appear to be an attempt" to create a durable power of attorney granting rights to R&W without "limitation as to time or circumstance," such that the Texas Statutory Durable Power of Attorney Act applies (including the Act's requirement of an acknowledged signature).  The Brief does not specifically set forth what provisions of the Engagement Contracts are unenforceable due to the lack of a notarized signature as

required by the Court. [35]

The Court interprets the Brief as an argument by the Chavez Family that all of the provisions of the Engagement Contracts are unenforceable because all of the provisions are powers of attorney.  The Court disagrees.  Certain provisions of the Engagement Contracts may constitute powers of attorney—such as the grant of power and authority by the Chavez Family to R&W to sign documents on behalf of the Chavez Family.  But the provisions of the Engagement Contract relevant here—granting of an attorney's lien by the Chavez Family to R&W to secure its expenses—do not resemble any type of power of attorney. [36]

In the Brief, the Chavez Family cites no cases or statutes that support the legal proposition that an employment contract between an attorney and client must be notarized or acknowledged to be effective and enforceable between the attorney and client.  Indeed, here the Engagement Contracts expressly state that they become effective on the date that they are signed by the client even "without execution of notarial." (Ex. CD-5).  More to the point, the Chavez Family cites no cases or statutes in the Brief that support the legal proposition that a contractual attorney's lien granted in an employment agreement is invalid, if the client's signature on the agreement is not notarized.

---

[35] The Brief also explains that unacknowledged affidavits and instruments may not be competent summary judgment evidence; which is of no consequence here.  There is no dispute that each of the members of the Chavez Family actually signed the Engagement Contracts, and the Engagement Contracts were admitted into evidence at trial by stipulation.

[36] A power of attorney is "a written instrument by which one person, the principal, appoints another person, the attorney-in-fact, as agent and confers on the attorney-in-fact the authority to perform specified acts on behalf of the principal."  *Comerica Bank-Texas v. Texas Commerce Bank Nat'l Ass'n*, 2 S.W.3d 723, 724 (Tex. App.—Texarkana 1999, pet. denied).

All that is required in Texas to create a contractual attorney's lien is a valid contract signed between the client and the attorney granting a lien. *See, e.g.*, *Tarrant Cty. Hosp. Dist. v. Jones*, 664 S.W.2d 191, 196-97 (Tex. App.—Fort Worth 1984, no writ) (attorney entitled to a lien on a percentage of his clients' recovery where attorney entered into a valid contract with his clients providing for such lien).   Notarized or acknowledged signatures are not required to create a contractual attorney's lien or a valid contract. This is consistent with other Texas law governing the grant of consensual security interests and liens; all that is required is the signature of the person on the contract granting the security interest and lien.   *See* Tex. Bus. & Com. Code §§ 9.102(7), 9.203(a)(3)(A) (security interest in personal property is enforceable when agreement is signed by person granting security interest).

In conclusion, for these reasons, the Court determines that the relief sought by the Trustee for an attorney's lien against the Chavez Family in the Trustee Counterclaims (dkt# 56) should be granted in part as follows.  The Trustee, on behalf of the R&W estate, has a valid contractual attorney's lien in the amount of $208,811 for R&W's expenses ("Lien").  The Lien is against all causes of action and claims of the Chavez Family against KCSR in the wrongful death suit (cause no. 2007-CVE-00347-D4 pending in State Court), and any amounts that may be recovered or collected by the Chavez Family based on such causes of actions and claims against KCSR.  The Court determines that any other relief sought by the Trustee for an attorney's lien against the Chavez Family in the Trustee Counterclaims (dkt# 56) should be denied.

(2) Quantum Meruit

The Trustee, on behalf of the R&W estate, seeks recovery of the reasonable value

of services rendered and expenses incurred by R&W from the Chavez Family in the wrongful death suit under the doctrine of quantum meruit. *See* Trustee Counterclaims (dkt# 56, ¶¶ 47-54). The Court finds that the quantum meruit claim made by the Trustee should be denied for three independent reasons.

First, the general rule is that a party cannot recover under quantum meruit when there is a valid contract covering services, according to the Texas Supreme Court. *Hill v. Shannon & Norman, LLP*, 544 S.W.3d 724, 733 (Tex. 2018) (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W. 3d 732, 740 (Tex. 2005)). Here, there are written contracts between R&W and the Chavez Family (the Engagement Contracts) governing the services to be rendered by R&W with respect to the wrongful death suit. (Ex. CD-5). The Court has not found the Engagement Contracts to be void or invalid. The Trustee has not cited or pointed the Court to any legal authority that would be an exception to the general rule that quantum meruit is not an available remedy. As a result, the existence of the Engagement Contracts signed by R&W with the Chavez Family precludes any recovery in quantum meruit by the Trustee.

Second, quantum meruit is an "equitable remedy" under Texas law that is based upon an implied promise to pay for beneficial services rendered and knowingly accepted. *Hill,* 544 S.W.3d at 732, 741 (supporting citations omitted). The ultimate decision regarding whether and how much equitable relief is warranted based on quantum meruit is a decision for the court. According to the Texas Supreme Court in *Hill*, the court should weigh equitable considerations particular to the case in deciding whether to grant equitable relief in the form of quantum meruit. *Hill,* 544 S.W.3d at 741 (citing *Burrow*, which allowed for fee forfeiture based on serious and clear breaches of fiduciary duty by

an attorney).

Here, the Court sees nothing equitable in allowing R&W to recover for services rendered for the Chavez Family under quantum meruit.   The Court has already exhaustively weighed the equitable considerations in this case and determined that the clear and serious breaches of fiduciary duty by R&W requires equitable forfeiture under *Burrow* of all R&W fees and a portion of R&W's expenses.   The equitable remedy of quantum meruit cannot be used by the Trustee to step around equitable forfeiture for breach of fiduciary duty.

Third, to recover under quantum meruit, the Trustee must prove that valuable services were rendered or valuable materials were furnished by R&W to the Chavez Family.  *See Hill,* 544 S.W.3d at 732 (citing *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990)).   The measure of damages for recovery under quantum meruit is the reasonable value of the work performed and the materials furnished.   *See Hill,* 544 S.W.3d at 732 (supporting citation omitted).   A claimant must introduce evidence on the correct measure of damages to recover under quantum meruit. Reliance on a bare contingency-fee percentage is not evidence of the reasonable value of the services for a quantum meruit claim.   *See Hill,* 544 S.W.3d at 732, 744.   Instead, an attorney seeking recovery for legal services based on quantum meruit must show that the fees are reasonable under the *Arthur Andersen* standard, which includes the results obtained by the attorney for the client. *See Hill,* 544 S.W.3d at 743; *Arthur Anderson & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

Here, the Trustee did not prove the reasonable value of the services provided by R&W for the Chavez Family that would support recovery of any fees under quantum

meruit. The fact that the Engagement Contracts signed by the Chavez Family provided for a 40% contingency fee is not evidence of the reasonable value of services rendered by R&W. No witness provided probative evidence at trial with respect to the *Arthur Anderson* factors as required by Texas law. Instead, the evidence showed that the Chavez Family received no value from the services provided by R&W and R&W obtained no tangible results for the Chavez Family. In short, R&W's services in the wrongful death suit resulted in a unanimous defense verdict against the Chavez Family in State Court. Although a new trial was granted, the new trial in State Court has been delayed for nearly a decade due to the dispute over the 2010 KCSR settlement precipitated by R&W.

With respect to the reasonable value of expenses, R&W incurred expenses on behalf of the Chavez Family in the prosecution of the wrongful death suit against KCSR totaling $417,622. The bulk of the expenses incurred by R&W appear to be for expert fees and deposition costs for the first jury trial. (Ex. P-38). In the context of equitable forfeiture for breach of fiduciary duty by R&W, the Court has already weighed the equitable considerations and determined that partial forfeiture of 50% of R&W's expenses ($208,811) is appropriate. In short, the Chavez Family has received limited value from such expenses for experts and depositions incurred in preparing the suit for the first jury trial, given the decade that has now passed. And again, the equitable remedy of quantum meruit for expenses cannot be used by the Trustee to avoid equitable forfeiture for breach of fiduciary duty.

In conclusion, for these several reasons, the Court determines that all relief sought by the Trustee for quantum meruit against the Chavez Family in the Trustee Counterclaims (dkt# 56) should be denied.

(3) Unjust Enrichment

The Trustee, on behalf of the R&W estate, also seeks recovery of attorney's fees in a reasonable amount and reimbursement of expenses incurred by R&W from the Chavez Family in the wrongful death suit under the doctrine of unjust enrichment.  *See* Trustee Counterclaims (dkt# 56, ¶¶ 52-55).  The Court finds that the unjust enrichment claim made by the Trustee should be denied for the following three separate reasons.

First, under Texas law, a claimant may recover for unjust enrichment if a person "has obtained a benefit from another by fraud, duress, or taking of an undue advantage." *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550 (5th Cir. 2010) (citing *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)).  Here, there was no probative evidence that any member of the Chavez Family committed fraud in its dealings with R&W, exercised any duress on R&W, or took undue advantage of R&W.  Indeed, the Trustee did not even plead (much less prove) any fraud, duress, or taking of any undue advantage by the Chavez Family.

Second, unjust enrichment applies when there is no actual contract between the parties, and thus is available under circumstances that give rise to an implied or quasi-contractual obligation to pay.  *Sullivan,* 600 F. 3d at 550; *Argyle Indep. Sch. Dist. v. Wolf,* 234 S.W.3d, 229, 247 (Tex. App.—Fort Worth 2007, no pet.) (supporting citations omitted).  Unjust enrichment is not an available remedy when there is an express contract between the parties covering the same subject matter.  *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).  Here, there are actual and express contracts between R&W and the Chavez Family (the Engagement Contracts) governing R&W's legal services and expenses for the Chavez Family in the wrongful death suit.

(Ex. CD-5). As a result, the Trustee is precluded from recovery under the theory of unjust enrichment.

Third, unjust enrichment is an equitable remedy that may be used when the person sought to be charged has "wrongfully secured a benefit" or "passively received a benefit" that would be "unconscionable" for the person to retain. *See, e.g., Villareal v. Grant Geophysical, Inc.,* 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied) (supporting citations omitted). As the Court has already found, the Chavez Family received no real benefit from the legal services rendered by R&W, and limited benefit from the expenses incurred by R&W. And under the circumstances of this particular case, it would not be unconscionable for the Chavez Family to retain the benefit of the fees and expenses incurred by R&W which have been equitably forfeited by the Court.

In conclusion, for these several reasons, the Court determines that all relief sought by the Trustee for unjust enrichment against the Chavez Family in the Trustee Counterclaims (dkt# 56) should be denied.

(4) Conclusion: Trustee's Other Counterclaims

For the reasons set forth above, the Court concludes that the relief sought by the Trustee for an attorney's lien against the Chavez Family in the Trustee Counterclaims (dkt# 56) will be granted in part as follows. The Trustee, on behalf of the R&W estate, has a valid attorney's lien in the amount of $208,811 for R&W's expenses (herein "Lien"). The Lien is against all causes of action and claims of the Chavez Family against KCSR in the wrongful death suit (cause no. 2007-CVE-00347-D4), and any amounts that may be recovered or collected by the Chavez Family based on such causes of actions and claims against KCSR. Any other relief sought by the Trustee for an attorney's lien against

the Chavez Family in the Trustee Counterclaims (dkt# 56) will be denied by the Court.

Finally, all relief sought by the Trustee for quantum meruit and unjust enrichment against the Chavez Family in the Trustee Counterclaims (dkt# 56) will be denied by the Court.

## V.
## FINAL CONCLUSION

***Those who fail to learn from history are condemned to repeat it.*** [37]

If history repeats itself, this Opinion (effectively *Chavez IV*) will not be the last written chapter in this litigation odyssey.  But after a full-blown trial in this Court followed by this full-length Opinion, perhaps the Chavez Family will agree to end their litigation marathon with KCSR now, without further expense and delay.  Failing that, the Court is concerned that history may repeat itself during the next phase of the journey—a second jury trial of the wrongful death suit in state court.

A separate Final Judgment will be signed by the Court and entered in this adversary proceeding under Rule 58 (which applies to adversary proceedings through Bankruptcy Rule 7058), consistent with this Opinion.

---

[37] Winston Churchill, House of Commons (circa 1948).

106